UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at Frankfort

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GYPSUM EXPRESS, LTD.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:22-cv-00061-SCM-EBA<br><br>**MEMORANDUM OPINION AND ORDER** |

*** *** *** ***

Before the Court are two dueling motions to exclude expert testimony. Plaintiff Equal Employment Opportunity Commission filed a motion to limit the testimony of Defendant Gypsum Express's proffered expert, Dr. Chen Song. [Dkt. 132]. In return, Defendant Gypsum Express moved to exclude the testimony of the Plaintiff's proffered expert, Dr. Erich Cromwell. [Dkt. 136]. For the following reasons, the Court **DENIES** both motions.

## I. Facts

The EEOC brought this action against Gypsum Express, Ltd., alleging that Gypsum "has engaged, and continues to engage, in a pattern or practice of hiring discrimination because of sex" since at least 2014, in violation of federal law. [Dkt. 1 at 1, 8]. Specifically, the EEOC alleges that Gypsum, a regional transportation-for-hire company with a focus on flatbed freight transportation, "has hired female drivers into flatbed positions at statistically significant lower rates than male drivers." [*Id.*

at 4]. The EEOC further alleges that such disparity resulted from Gypsum's formal policy requiring inexperienced drivers to be paired with an experienced driver of the same sex. [*Id.*]. More specifically, the EEOC contends that because Gypsum did not employ any experienced female drivers, the ultimate result of that policy was that Gypsum recruiters were precluded from hiring qualified female applicants for flatbed driver roles. [*Id.*].

The parties submitted competing expert reports concerning Gypsum's flatbed driver hiring rates. Dr. Erich Cromwell, an in-house labor economist employed with the EEOC, prepared an initial report on behalf of the EEOC analyzing Gypsum's hiring practices from March 25, 2014, to December 13, 2023. [Dkt. 132-3 at 3]. Dr. Cromwell performed a regression analysis utilizing a database of over 110,000 applicants during that timeframe and comparing those applicants to records of Gypsum's hires. [*Id.* at 11–15]. For the applicant pool, Dr. Cromwell included applicants from various hiring platforms that completed the license or employment history table of an application. [*Id.* at 16–18]. The initial report misidentified several flatbed drivers as female, so Dr. Cromwell produced a supplemental report that corrected these errors. [Dkt. 132-4 at 3].

Dr. Cromwell then calculated the rate at which Gypsum selected male and female applicants for flatbed driver positions, taking into account the likelihood that the variance in selection rates was due to chance. [*Id.* at 20–21]. Dr. Cromwell found a statistically significant under-hiring of female applicants at 8.24 standard deviations and found that female applicants are approximately half as likely to be

hired by Gypsum as equally qualified male applicants. [*Id.* at 21]. Dr. Cromwell further concluded that the likelihood that random chance accounted for this disparity was less than one in a quadrillion. [*Id.* at 6]. Next, to determine whether any other factors might explain the disparity, Dr. Cromwell controlled for numerous other factors that Gypsum considers in its hiring practices, such as previous involvement in motor vehicle accidents or traffic violations. [*Id.* at 23, 37–45]. Dr. Cromwell's report indicates that the results still showed a statistically significant lower hiring rate for female applicants at 8.20 standard deviations. [*Id.* at 41].

Gypsum then proffered a report by its retained expert, Dr. Chen Song, in response to Dr. Cromwell's report. [Dkt. 132-5]. Dr. Song used the same applicant data as Dr. Cromwell but imposed different parameters resulting in a smaller applicant pool. [*Id.* at 32]. Dr. Song excluded candidates that did not complete at least four tables on the application, applicants that listed a home address more than 300 miles from the nearest Gypsum terminal, and applicants that did not report having attended a trucking school or having either a CDL-A license or prior work experience. [*Id.*]. These parameters produced an applicant pool of 29,536 applicants, which Dr. Song further narrowed to a pool of 16,937 applicants that explicitly indicated they were applying to a flatbed driving position. [*Id.*].

Using these applicant pools, Dr. Song performed regression analyses that also indicated Gypsum under-hired female applicants for flatbed positions, often at statistically significant levels. [*Id.* at 48–52]. Dr. Cromwell then provided a rebuttal report noting that Dr. Song failed to incorporate the corrections for flatbed hires that

were previously misidentified as female. [Dkt. 132-6 at 3]. In response, Dr. Song prepared a supplemental report correcting those errors and updating her findings. [Dkt. 132-7 at 3]. In her supplemental report, Dr. Song analyzed Gypsum's hiring data for the period of March 2014 to December 2023—the "aggregated regression"—and found a statistically significant difference in the hiring rates between male and female applicants at 8.184 standard deviations for all applicants and 5.721 standard deviations for applicants who indicated specific interest in flatbed roles. [*Id.* at 49–50].

Dr. Song then performed regressions on each year separately—the "disaggregated regressions"—and found statistical significance for 2015, 2016, 2017, 2018, 2019, 2020, and 2023 for all applicants, and in 2014, 2015, 2016, 2018, 2022, and 2023, found statistical significance for applicants who specifically applied to flatbed positions. [*Id.* at 52–53]. Using the disaggregated regression and the narrower parameters, Dr. Song analyzed the hiring rates for each year from 2014 to 2023. [*Id.* at 39]. From this, Dr. Song concluded that Gypsum's rate of female hires has increased in recent years. [*Id.*]. Dr. Song further concluded that in 2021, the female hiring rate exceeded the male hiring rate and used that data to opine that "the historical lower female hiring rate to Gypsum's flatbed positions no longer existed in 2021 when the female hiring rate exceeded the male hiring rate." [*Id.* at 11, 38–39].

Additionally, Dr. Song compared Gypsum's statistics to those of the trucking industry at large by comparing Gypsum's statistics to an "industry benchmark." [*Id.* at 40–47]. To derive an industry benchmark, Dr. Song first noted that she could not

identify any sources that reputably report percentages of female flatbed drivers in the trucking industry at large. [*Id.* at 43]. As a result, Dr. Song developed her findings from a paper titled, "Driving in a man's world: examining gender disparity in the trucking industry," which was authored by Alex Scott and Beth Davis-Sramek and published in the International Journal of Physical Distribution & Logistics Management in 2023 (the "Scott/Davis-Sramek Study."). [*Id.* at 44]. The Scott/Davis-Sramek Study compiled data from the United States Federal Motor Carrier Safety Administration (FMCSA) to produce findings as to the number of female tractor-trailer drivers in the United States. [*Id.*]. From this study, Dr. Song concluded that the relevant "industry benchmark range" for female drivers was between 1.28% and 4.05% in 2019 and Gypsum's female hiring rate in 2019 fell within this range at 2.4%. [*Id.* at 46]. Dr. Song then concluded that "Gypsum's female headcount and female hiring rates were within the range of industry benchmarks since at least as early as 2019." [*Id.* at 47].

The EEOC moved to limit Dr. Song's testimony, specifically seeking the exclusion of Dr. Song's industry benchmark and hiring rate opinions. [Dkt. 132]. The EEOC contends that these opinions are irrelevant and unreliable and have the potential to mislead or confuse the jury. [Dkt. 132-1 at 9]. Gypsum then moved to exclude Dr. Cromwell's opinion in its entirety, contending that Dr. Cromwell's opinion is not based on sufficient facts or data and would confuse, rather than assist, the trier of fact. [Dkt. 136-1 at 2]. Following the completion of briefing on these motions, the Court set the matter for a hearing, to allow the parties to further develop their

arguments. [Dkt. 186; Dkt. 189]. The Court conducted the hearing on September 22, 2026, [Dkt. 193], and the motions are now ripe for the Court's review.

## II. Analysis

### A. Motion to Exclude Standard

Federal Rule of Evidence 702 "gives district courts a 'gatekeeping role' in screening the reliability of expert testimony." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010) (quoting *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). District courts fulfill that role when presented with a motion to exclude expert evidence by determining "whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). The court's inquiry generally involves consideration of a "non-exclusive checklist" of factors, such as "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).

On a motion to exclude expert testimony, "[i]t is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10 (1993)). Admissibility of expert testimony is governed specifically by Federal Rule of Evidence 702 which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Sixth Circuit has distilled this into three specific requirements for the admissibility of expert testimony. *In re Scrap Metal Antitrust Litig.,* 527 F.3d at 528–29. First, the proposed expert must have the requisite qualifications, whether it be through "knowledge, skill, experience, training, or education." *Id.* at 529 (quoting Fed. R. Evid. 702).

Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Fed. R. Evid. 702). In determining whether an expert's testimony will be relevant, courts look to "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quoting Fed. R. Evid. 702, Adv. Comm. Notes).

And "[t]hird, the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. Rule 702 provides several criteria by which a district court, in its gatekeeper role, should gauge the reliability of expert testimony. A court should look to "whether the testimony is based upon 'sufficient facts or data,'; whether [it] is

the 'product of reliable principles and methods,' and whether the expert 'has applied these principles or methods reliably to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702). In determining reliability, a district court should also consider "such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community." *Langan*, 263 F.3d at 621 (citing *Daubert*, 509 U.S. at 593–94). The reliability inquiry is a flexible one, and the above factors are not a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

District courts have wide latitude in determining whether a particular expert's testimony is reliable. *See, e.g., Tamraz,* 620 F.3d at 672; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Notably, in exercising this discretion, a court must be careful not "to impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**B. Dr. Chen Song's Testimony**

The EEOC seeks to limit two specific portions of Dr. Chen Song's testimony. First, the EEOC seeks exclusion of the "industry benchmark" figure, which Dr. Song compared to Gypsum's hiring rate and concluded that Gypsum's female hiring rate

tracked that of the trucking industry at large. [Dkt. 132-1 at 10–19]. The EEOC contends that the industry benchmark has no relevance because Gypsum's actual applicant data is available. [*Id.* at 11–14]. The EEOC further takes issue with the single study Dr. Song relied upon to calculate the benchmark. [*Id.* at 14–19]. Second, the EEOC seeks exclusion of Dr. Song's "hiring rate opinion" that in 2021, claims Gypsum's female hiring rate exceeded the male hiring rate. [*Id.* at 19–21]. The EEOC argues that Dr. Song did not base this opinion upon reliable data or methods. [*Id.*]. The Court addresses these arguments in turn.

1. Industry Benchmark

As explained above, Dr. Song utilized the Scott/Davis-Sramek Study to infer the benchmark range that is the subject of the present motion. [Dkt. 132-7 at 44–47]. To estimate the proportion of female truck drivers, the Scott/Davis-Sramek Study relied on roadside inspection data from the FMCSA and inferred the driver's gender based on the first name from the inspection file and the historical likelihood of someone with that name being either male or female, as reported by the Social Security Administration. [Dkt. 132-9 at 8]. The study relied upon over nineteen million roadside inspections between the years 2010 and 2019 and concluded that the share of female truck drivers increased from 2.6% in 2010 to 3.2% in 2019. [*Id.* at 8–9, 11]. The study further found that female representation increased for companies with larger fleets and companies that transported over long distances. [*Id.*]. However, the study did not specifically extrapolate flatbed trucking operations.

Although Dr. Song noted that because the study "did not specifically identify flatbed trucking operations, no single estimate is directly comparable to Gypsum," Dr. Song used these figures to estimate an industry benchmark range for a trucking company comparable to Gypsum. [Dkt. 132-7 at 46]. Dr. Song noted that Gypsum had around 500 drivers in 2019, and while some Gypsum drivers drive locally, the majority are long-distance drivers. [*Id.*]. The Scott/Davis-Sramek Study found a 4.05% rate of female drivers for carriers with between 101 and 1,000 trucks, with a 1.28% rate for local carriers and 3.61% for long-distance carriers. [*Id.*]. Thus, Dr. Song considered the industry benchmark range for female drivers to be between 1.28% and 4.05% in 2019. [*Id.*]. Dr. Song then concluded that Gypsum's relevant hiring rates fell within this range. [*Id.* at 46–47].

The EEOC asks the Court to exclude Dr. Song's industry benchmark opinion on several grounds. First, the EEOC asserts that the opinion "is neither relevant nor reliable because Gypsum's actual applicant flow data is available." [Dkt. 132-1 at 11–14]. Essentially, the EEOC contends that because actual applicant data is more reliable and generally superior to industry or market comparisons, the industry benchmark should be excluded as irrelevant. [*Id.*]. Gypsum, on the other hand, contends that the EEOC's argument would hold weight only if Dr. Song had utilized the industry benchmark to the exclusion of the actual applicant data. [Dkt. 149 at 5–10]. Instead, Dr. Song utilized the industry benchmark in addition to the actual applicant data, in an effort to provide additional context to Gypsum's data. [*Id.*]. In Dr. Song's deposition, she specifically noted that the purpose of the industry

benchmark was to account for any disparity that could be explained by the lack of female interest and participation in the trucking industry more generally. [Dkt. 149-2 at 5]. Dr. Song explained that the industry benchmark demonstrates the limited pool of female applicants for the broader trucking industry, which puts a restraint on the number of women Gypsum has the ability to hire. [*Id.* at 5–7].

In *Daubert*, the Supreme Court noted that the relevance standard is a "liberal one" as defined in Federal Rule of Evidence 401. 509 U.S. at 587 (" 'Relevant evidence' is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"). At this stage, the parties' dispute concerns whether Gypsum engaged in a "pattern or practice" of discrimination, which requires the EEOC to show the "unlawful discrimination has been a regular procedure or policy followed by an employer." *Serrano v. Cintas Corp.*, 699 F.3d 884, 893 (6th Cir. 2012) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 (1977)). To make such a showing, the EEOC may present statistical evidence to demonstrate that discrimination is a defendant's "standard operating procedure." *See O'Donnell v. City of Cleveland*, 148 F. Supp. 3d 621, 636 (N.D. Ohio 2015) (citing *Teamsters*, 431 U.S. at 336–38). Gypsum may then rebut the EEOC's case by showing that its statistics are "inaccurate or insignificant, or by providing a nondiscriminatory explanation for the apparent discrimination." *EEOC v. Wal-Mart Stores, Inc.*, No. 6:01–CV–339–KKC, 2010 WL 583682, at *1 (E.D. Ky. Feb. 16, 2010) (citing *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1285 (5th Cir. 1994)).

Against this backdrop, Dr. Song's industry benchmark clears the "liberal" relevance standard. Gypsum could offer the industry benchmark in an attempt to minimize the potency of the EEOC's statistics, a permissible and relevant purpose, or to provide an explanation, other than discrimination, for the disparity in its female hiring rate. Certainly, evidence that seeks to disprove the existence of discrimination or provide a nondiscriminatory explanation for the apparent discrimination would be relevant to a pattern-or-practice claim. And Dr. Song's proposed testimony about the industry benchmark does just that with dots that are easy to connect.

The chain of reasoning goes like this: There is evidence showing that flatbed driving jobs are more labor intensive and more physically demanding—and therefore less desired—than other driving jobs. [Dkt. 132-7 at 43]. In light of the greater physical demands on flatbed truck drivers, Dr. Song theorizes that female representation among flatbed truck drivers might be even lower than among the general population of truck drivers. So one would expect even a non-discriminatory company to employee female flatbed truck drivers at a rate lower than the overall rate of employment of female truck drivers generally. Thus, if Gypsum's employment of female flatbed truck drivers is on par with the trucking industry's overall rate of employment of female truck drivers generally, then it would appear all the less likely that Gypsum is engaged in discrimination. Of course, the EEOC would remain free to argue that other inferences should be drawn from the data and would also remain free to convince the fact finder that Gypsum's actual applicant data is preferable to the industry benchmark. But that does not call for the exclusion of the benchmark

altogether. The industry benchmark is relevant information, and Gypsum should be able to present it and argue its significance to the jury.

The EEOC cites several authorities that appear to indicate a preference for actual applicant data over industry benchmarks. [Dkt. 132-1 at 11–14]. But, tellingly, nearly all of the EEOC's cited authorities relate to the *weight* given to such data, not its admissibility. *See, e.g*, *Solis v. Ohio State Univ. Wexner Med. Ctr.*, No. 24-3230, 2024 WL 4579501, at *7 (6th Cir. Oct. 25, 2024) (affirming district court's ruling from a summary judgment posture and noting that the use of a national comparator, rather than a regional comparator, was improper under the facts); *Mister v. Ill. Cent. Gulf R.R.*, 832 F.2d 1427, 1435 (7th Cir. 1987) (explaining the advantages of actual applicant data over census data to determine whether the plaintiff had raised an "inference of discrimination."); *Pollocks v. Sunland Training Ctr.*, 85 F. Supp. 2d 1236, 1241–42 (N.D. Fla. 2000) (finding the expert who analyzed actual applicant data more "credible" than the expert who only used census data and did not analyze actual applicant data).

The EEOC attempts to draw parallels to a previous opinion of this Court that resulted in the exclusion of an expert witness. [Dkt. 132-1 at 12]. In *EEOC v. Wal-Mart*, the EEOC asserted that Wal-Mart discriminated against women in the hiring of "order fillers" at one of its distribution centers. 2010 WL 583682 at *1–2. Wal-Mart sought to bolster its defenses with an expert witness who proposed to testify about the rate at which women were hired nationally to fill jobs in 32 different occupations that—in his opinion—also involved "very heavy work." *Id.* at *3. 'The

expert specifically opined that the order filler job qualified as "very heavy work," and employment statistics for such work tends to skew towards males in the national market. *Id.* The Court found the testimony "irrelevant and potentially confusing" because the expert considered 32 different occupations across the nation, most of which were dissimilar to the order filler role, when the relevant market only included order fillers in London, Kentucky. *Id.* Further, the expert did not include statistics relating to the actual applicants, despite having such information available. *Id.*

That conclusion makes sense in the context of that case. After all, other than the fact that they all purportedly involved "very heavy work," there was no reason to believe that the "order filler" job and the 32 other occupations had any similarities, and even less reason to believe that they should have had comparable employment rates for women. The present case is distinguishable though. First, unlike the expert in *EEOC v. Wal-Mart*, Dr. Song *did* analyze the actual applicant data and simply provided the industry benchmark as an additional reference point, not in the place of actual applicant data. Further, the jobs considered by Dr. Song are all within the same industry, and therefore much more logically comparable. In *EEOC v. Wal-Mart*, the expert compared—among other things—lifeguards and hunters to order fillers. *Id.*, at *3. Here, Dr. Song compared tractor-trailer drivers at Gypsum to tractor-trailer drivers for other carriers. Thus, the comparison here is a much more apples-to-apples comparison, and therefore more reliable and valid. The EEOC has, at most, called into question the weight the factfinder should give to Dr. Song's industry

benchmark. It has not provided the Court with any reason to doubt the relevance or admissibility of the industry benchmark.[1]

Next, the EEOC contends that the industry benchmark opinion did not result from reliable principles and methods because the Scott/Davis-Sramek Study is not a reliable authority, and even if it were, it does not prove a reliable basis for the industry benchmark opinion. [Dkt. 132-1 at 14–17]. The EEOC argues that, even though the study appears in a peer-reviewed publication, that alone does not make it a reliable authority to establish an industry benchmark. [*Id.* at 14]. Further, the EEOC contends that that study analyzed female tractor-trailer drivers generally, and did not provide data on female flatbed drivers, nor did Dr. Song explain how statistics on the industry at large are representative of the proportion of female drivers for flatbed trucks in particular. [*Id.* at 15–16].

In response, Gypsum notes that Dr. Song expended significant efforts to locate relevant data on female flatbed drivers but could only locate statistics regarding female truck drivers in the broader trucking industry. [Dkt. 149 at 10–11]. Dr. Song then extrapolated that data to provide a range that, based on her research, she believed to be representative of the industry benchmark. [*Id.*]. Gypsum further argues that neither the EEOC nor Dr. Cromwell identified any alternative reports or industry benchmark data that would have been more reliable than the Scott/Davis-

[1] At the hearing on the *Daubert* motions, the EEOC put virtually all of its emphasis on arguing that the industry benchmark would be confusing to the jury. There is no reason to exclude the evidence on that ground. The Court is confident that the jury can sort out the relevance of this evidence. Moreover, an appropriate instruction can mitigate any potential confusion.

Sramek Study. [*Id.* at 11]. And Gypsum also argues that all of the cases cited by the EEOC relate to experts who relied on a single study, while refusing to address other relevant studies. [*Id.*].

The EEOC's reliability objection is not well taken. In *Daubert*, the Supreme Court listed several specific factors to assist courts in determining the reliability of expert testimony. 509 U.S. at 590 n.8. These factors include: whether a theory or technique can be or has been tested; whether the theory has been subject to peer review and publication whether there is a high known or potential error rate; whether there are certain operation standards that should have been or were followed; and whether the theory or technique is generally accepted within the scientific community. *Id.* at 592–94. However, those factors are not definitive and district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152.

Upon review, Dr. Song's industry benchmark easily clears the reliability threshold. The EEOC acknowledges that Dr. Song based the industry benchmark on a peer-reviewed publication, the Scott/Davis-Sramek Study, and the EEOC does not call into question the methodologies or data used by the study. [Dkt. 132-1 at 14–17]. Rather, the EEOC faults Dr. Song for failing to perform any independent tests of her own in formulating the industry benchmark. But the EEOC provides no authority supporting such a requirement. Instead, "[u]nder Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."

*Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004) (citing *Barris v. Bob's Drag Chutes & Safety Equip., Inc.*, 685 F.2d 94, 102 n.10 (3rd Cir. 1982)); *see also Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 853 (6th Cir. 1981) ("Great liberality is allowed the expert in determining the basis of his opinions under Rule 703.").

Further, the EEOC has provided no reason to question the reliability of the Scott/Davis-Sramek Study. On the contrary, Gypsum notes that the study, in addition to being published in a peer-reviewed journal itself, has been cited approximately twenty times in other peer-reviewed journals. [Dkt. 149 at 11]. Additionally, Dr. Song described in her report how the Scott/Davis-Sramek Study validated its results by comparing the data to a database of commercial truck driver's' licenses, further confirming its reliability. [Dkt. 132-7 at 45]. All of the foregoing confirms the reliability of Dr. Song's industry benchmark. In essence, the EEOC conflates the "credibility and accuracy" of the industry benchmark with its "reliability." *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30 ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

Finally, the EEOC contends that the industry benchmark opinion does not reflect a reliable application of the Scott/Davis-Sramek Study to the facts of the case because Gypsum is not "truly comparable" to any of the data provided by the study. [Dkt. 132-1 at 17–19]. The EEOC notes that, aside from grouping flatbed and non-flatbed drivers into the same dataset, Dr. Song relied upon the study's "broad

findings, from industries as diverse as livestock carriers, U.S. mail carriers and passenger carriers." [*Id.* at 18]. Further, Dr. Song's industry benchmark ranged from 1.28%, relying on the data for local carriers, even though the majority of Gypsum's drivers drive long distances and the study acknowledged that women are "vastly underrepresented" in local driving positions. [*Id.*]. The EEOC believes that, at the very least, the industry benchmark should be anchored at 3.61%, which represents the percentage of female drivers for long distance carriers with a fleet of 101 to 1,000 trucks, in order to comprise a sufficient comparison to Gypsum. [*Id.*]. Finally, the EEOC contends that Dr. Song's comparison of her industry benchmark to Gypsum's overall female driver headcount—which counts both flatbed and non-flatbed drivers—should be excluded because non-flatbed drivers are not at issue in this case. [*Id.* at 18–19].

In essence, the EEOC argues that the industry benchmark compares "apples to oranges." Gypsum retorts that the EEOC's arguments relate to the weight of Dr. Song's industry benchmark, not its admissibility. [Dkt. 149 at 13]. Gypsum is right. First, the EEOC's argument as to the proper anchor for the benchmark seeks, in effect, to disprove Dr. Song's conclusion and thereby show that her methodology in reaching those conclusions must be flawed. However, "the Court's role here is not to determine the correctness of [Dr. Song's] opinion but instead simply whether it is based upon a reliable foundation." *Powell v. Tosh*, 942 F. Supp. 2d 678, 690 (W.D. Ky. 2013) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30); *see also Cellmark, Inc. v. Webster*, No. 2:24-cv-00181-SCM-CJS, 2026 WL 1510362, at *4 (E.D.

Ky. May 29, 2026) ("The reliability inquiry focuses 'solely on the principles and methodology, not on the conclusions they generate.'" (quoting *Johnson v. BLC Lexington SNF, LLC*, 478 F. Supp. 3d 578, 589 (E.D. Ky. 2020))). Thus, this argument goes to the weight of Dr. Song's testimony, which does not render her testimony inadmissible. *See Cellmark, Inc.*, 2026 WL 1510362 at *5 ("And so any alleged weaknesses in the factual bases underlying those opinions are matters that go to the weight of [the expert's] opinions, not their admissibility." (citations omitted))

In sum, Dr. Song's industry benchmark is not the type of "subjective belief or unsupported speculation" that can lead to exclusion of testimony. *Daubert*, 509 U.S. at 590; *Finn v. Warren County, Ky.*, 768 F.3d 441, 452 n.1 (6th Cir. 2014). To be sure, the points offered by the EEOC open up the potential for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" at trial. *Daubert*, 509 U.S. at 596. But, as it concerns admissibility, Rule 702 "does not require anything approaching absolute certainty." *Tamraz*, 620 F.3d at 671–72 (citing *Daubert*, 509 U.S. at 590). Dr. Song's industry benchmark is sufficiently relevant and reliable, and accordingly, the EEOC's motion to exclude this portion of her testimony will be denied.

2. <u>Hiring Rate Opinion</u>

The EEOC next seeks exclusion of Dr. Song's "hiring rate" opinion, in which she opined that the female hiring rate at Gypsum exceeded the male hiring rate by more than 50% for a portion of the relevant time period. [Dkt. 132-1 at 19–21]. The EEOC asserts that Dr. Song calculated this figure by only including applicants that

specifically indicated they were applying for a flatbed position, although in practice, Gypsum regularly hired applicants to flatbed positions even if they did not specifically apply to that position. [*Id.* at 20]. To demonstrate its argument, the EEOC points to Dr. Song's report, which indicates that Gypsum hired 1,348 applicants that specifically applied for flatbed driver positions and hired 1,663 total flatbed drivers. [*Id.* (citing [Dkt. 132-7 at 33–35])]. The upshot is that Gypsum hired over 300 applicants into flatbed positions that either applied to a different position or did not indicate which position they were seeking in their application. [*Id.*]. Thus, the EEOC asserts that Dr. Song's hiring rate opinion does not embrace reliable methods or reflect Gypsum's actual hiring practices. [*Id.*].

Rather than presenting a basis to exclude the testimony, the EEOC's arguments are better suited for cross-examination of Dr. Song. The EEOC does not call into question the methods used by Dr. Song or the data which she based her opinion on. [Dkt. 132-1 at 19–22]. Instead, the EEOC essentially contends that Dr. Song's hiring rate opinion is misleading and offers only a portion of the truth. [*Id.*]. If the Court were to exclude the opinion on that basis, it would overstep its narrow "gatekeeper" function and impinge on the role of the jury. At trial, the EEOC remains free to cast doubt on Dr. Song's hiring rate opinion by providing the broader context and offering its competing hiring rate opinion, and the jury will be free to accept whichever narrative it finds more convincing. Thus, the Court will deny the EEOC's motion to exclude Dr. Song's hiring rate opinion.

**C. Dr. Erich Cromwell's Testimony**

Gypsum seeks the exclusion of the EEOC's expert, Dr. Erich Cromwell, on several grounds, all of which relate to the applicant pool used by Dr. Cromwell. [Dkt. 136-1]. Gypsum does not dispute that Dr. Cromwell is qualified, nor does Gypsum contest the reliability of the methodology he used. Instead, Gypsum contends that Dr. Cromwell's testimony fails to meet the third requirement of the Rule 702 test. [*Id.* at 3–9]. Gypsum argues that Dr. Cromwell's testimony is not based on sufficient facts or data and thus not the product of reliable principles and methods. [*Id.* at 9–11]. Gypsum further argues that these deficiencies mean that Dr. Cromwell's opinion will not assist the trier of fact in understanding the evidence or determining a fact in issue. [*Id.* at 11–14]. The Court addresses these arguments in turn.

Gypsum's arguments essentially boil down to a contention that Dr. Cromwell constructed an over-inclusive applicant pool, so the resulting testimony is not based on sufficient facts or data, reliable, or likely to assist the trier of fact. [Dkt. 136-1 at 3–14]. More specifically, Gypsum contends that Dr. Cromwell improperly included applicants that submitted less than a full application ("leads") and individuals who live outside of Gypsum's hiring areas, thus producing misleading results. [*Id.* at 4–7]. Gypsum contends that Dr. Cromwell's inclusion of "leads" does not represent applicants with actual interest in working as a flatbed hire for Gypsum. [*Id.* at 4–6]. As an example, Gypsum notes that Dr. Cromwell used over 20,000 records from an online job board, "AllTruckJobs," that allows a candidate to apply to several companies at one time. [*Id.* at 5]. Thus, Gypsum asserts that those candidates did

not specifically apply to Gypsum and should not have been included in the applicant pool. [*Id.*]. Additionally, Gypsum argues that Dr. Cromwell included applicants who did not submit a full application and falsely inflated the pool to include applicants that did not express specific interest in a flatbed driving role. [*Id.* at 5–6].

The EEOC, on the other hand, casts these "leads" in a different light. The EEOC asserts that applicants using AllTruckJobs select certain companies of interest, and then—when prompted to submit an application—the candidates select "Companies of My Choice," which sends their application to the previously selected companies of interest. [Dkt. 143 at 9]. The EEOC further notes that Tina Trapp, Gypsum's Recruiting Administrator and Processing Coordinator, testified that applicants could apply directly to Gypsum using a job board, and may have applied *only* to Gypsum using the job board. [*Id.*]. Additionally, relying on Ms. Trapp's testimony, the EEOC notes that Gypsum ran hiring campaigns on AllTruckJobs and applicants could submit a variety of types of application, including a "direct lead," which meant the applicant knew he or she was applying directly to Gypsum. [*Id.* at 9–10].

The EEOC also posits that Dr. Cromwell expressly considered the nuance of lead sources in constructing the applicant pool, specifically considering that recruiters were incentivized to solicit complete applications from candidates most likely to be hired. [*Id.* at 10]. Deposition testimony in this matter supports the proposition that recruiters did not follow up with female leads because the recruiters knew that, with no way to train female hires, Gypsum would be unlikely to hire them.

[Dkt. 143-3 at 3]. Thus, if recruiters knew that male "leads" were more likely to be hired, they would have expended more effort turning male "leads" into full applications. In the EEOC's view, this means that to ignore the "leads" in constructing an applicant pool would be to ignore the discriminatory hiring practices altogether. [Dkt. 143 at 10].

Dr. Cromwell's statistical data is not so fatally flawed that the Court must exclude it. Much like the EEOC's objections to Dr. Song's opinions, Gypsum essentially lodges complaints as to the weight of Dr. Cromwell's testimony, not its admissibility. *See Counts v. General Motors, LLC*, 606 F. Supp. 3d 547, 572 (E.D. Mich. 2022) ("But issues with sample size go to the weight, not the admissibility, of expert evidence." (citing *Kanuszewski v. Shah*, No. 1:18-CV-10472, 2022 WL 327710, at *3 (E.D. Mich. Feb. 3, 2022))). "The reliability inquiry focuses 'solely on the principles and methodology, not on the conclusions they generate.'" *Cellmark, Inc.*, 2026 WL 1510362 at *4 (quoting *Johnson*, 478 F. Supp. 3d at 589). Dr. Cromwell's applicant pool might include applicants who were never interested in a flatbed role at Gypsum, but Gypsum is welcome to argue that to the jury. Whether an expert did or did not consider all possible contributors to the disparity in hiring rate is an issue that can be addressed by cross-examination, which is "the traditional and appropriate means of attacking" statistics that Gypsum believes are not credible. *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

Further, Dr. Cromwell explicitly relied upon deposition testimony of Gypsum employees and documented hiring practices to construct his applicant pool. *See*

*Stephenson v. Fam. Sol. of Ohio, Inc.*, 645 F. Supp. 3d 755, 774 (N.D. Ohio 2022) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530) ("Indeed, the Sixth Circuit has expressly held that testimony based on allegedly erroneous facts is generally admissible 'when there is some support for [those] facts in the record.'"). Dr. Cromwell included applicants who did not specifically indicate interest in a flatbed role because the records provided by Gypsum—and relied upon by Gypsum's own expert—indicated that applicants were hired into flatbed roles even without indicating specific interest in a flatbed role. And testimony from Gypsum's Recruiting Administrator indicated that Gypsum may have hired "leads" if they were male, so Dr. Cromwell included them. Thus, his decision as to the applicant pool has factual support in the record.

The same logic applies to Gypsum's argument regarding the inclusion of applicants outside of Gypsum's hiring areas, among other qualifications. For example, Dr. Cromwell limited his applicant pool to applicants that resided in the 22 states where Gypsum's flatbed drivers reside. Gypsum takes issue with Dr. Cromwell's inclusion of applicants that lived further than 300 miles from the nearest Gypsum terminal, contending the Gypsum would not hire such an employee. [Dkt. 136-1 at 6–7]. But, again, Dr. Cromwell based his assumption on facts that had support in the record. The record indicates that, although Gypsum set certain "minimum hiring standards," Gypsum deviated from these standards at times depending on its hiring needs. Thus, Dr. Cromwell's inclusion of applicants that may not have met Gypsum's stated hiring standards is supported by Gypsum's actual

hiring practices. All this is to say that Dr. Cromwell relied on far more than guesswork or "unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527, F.3d at 530. While Gypsum may have presented reasons to criticize the credibility of Dr. Cromwell's opinion, they are not grounds to exclude his testimony.

## III. Conclusion

For these reasons, it is hereby **ORDERED** as follows:

1) Plaintiff Equal Employment Opportunity Commission's Motion to Limit the Testimony of Dr. Chen Song, [Dkt. 132], is **DENIED**
2) Defendant Gypsum Express, Ltd.'s Motion to Exclude the Testimony of Dr. Erich Cromwell, [Dkt. 136], is **DENIED**

Signed this 29th day of September, 2026.

S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky