UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at Frankfort

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | Case No. 3:22-cv-00061-SCM-EBA |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| GYPSUM EXPRESS, LTD., | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is before the Court on cross-motions for summary judgment as to the EEOC's pattern-or-practice claim. [Dkt. 131; Dkt. 135]. For the reasons that follow, the Court will **GRANT in part** and **DENY in part** the EEOC's motion [Dkt. 131] and will **DENY** Gypsum's motion. [Dkt. 135].

## I. Facts

Gypsum Express, Ltd., is a regional transportation-for-hire company, with a primary focus on flatbed freight transportation. John Wight is the CEO, founder, and owner of Gypsum. [Dkt. 147-5 at 3]. Tim Sheppard became Gypsum's President in 2025. Sheppard also still retains his prior position of Vice President of Flatbed Operations, a role he has held since 2013. [Dkt. 147-8 at 6]. In total, Sheppard has been with Gypsum for more than 25 years. [*Id.*]. A "combined corporate group" directs Gypsum's decision making with respect to flatbed operations, and consists of Wight, Sheppard, Mike Flynn, Kevin Brennan, and Larry Wight. [Dkt. 147-5 at 4].

This group has been in place for less than two years. [*Id.*]. Previously, John Wight made final decisions related to flatbed operations, often upon the input of Brennan and Sheppard. [*Id.*].

Gypsum's flatbed trucking positions see a high turnover rate, and Gypsum acknowledges that the flatbed driver positions are among the most difficult to fill. [Dkt. 147-10 at 23; Dkt. 147-7 at 18, 71]. By its own account, Gypsum attributes this to the demanding responsibilities imposed upon flatbed drivers by the Federal Motor Carrier Safety Regulations, which often require the performance of tasks in all variety of adverse weather conditions. [Dkt. 135-1 at 11; Dkt. 135-11 at 10;]. Gypsum fills its positional needs with both experienced and inexperienced drivers. [Dkt. 147-11 at 4]. An applicant is considered "inexperienced" if the applicant is a recent graduate of a commercial driving training program or if the applicant otherwise has less than six months of flatbed driving experience. [Dkt. 147-12 at 3–4; Dkt. 147-5 at 7]. An inexperienced applicant would be required to undergo Gypsum's training program once hired.

Gypsum hired flatbed drivers through the work of a team of between three and eight recruiters. [Dkt. 147-8 at 9; Dkt. 147-7 at 7]. All but one of these recruiters at any given time were dedicated entirely to the recruitment of flatbed drivers.[1] [Dkt. 147-7 at 10; Dkt. 147-8 at 11]. The various recruiters reported to various recruitment managers including Recruiting Director Dale Zimmerman between October 2013 and

[1] The recruiter not solely dedicated to flatbed recruitment also recruited for Gypsum's smaller van-driver line of work, which was solely based out of its Baldwinsville, New York terminal.

April 2017, Recruiting Manager Tammy Moss between April 2018 and July 2019, and Recruiting Director Dan Murphy between July 2019 and February 2021.[2] [Dkt. 147-7 at 6; Dkt. 147-13 at 11, 28; Dkt. 147-8 at 10]. Zimmerman reported directly to Sheppard. [Dkt. 147-7 at 7]. The record indicates that following Zimmerman's departure, Sheppard remained very active in the operations of the recruitment department, including weekly calls with recruiters and the review of applications. [Dkt. 147-10 at 24]. Maxine Sears-Cornelius served as Director of Orientation and Training from September 2016 until June 2018 and likewise reported directly to Sheppard. [Dkt. 147-14 at 3, 9, 13]. At all times, recruiters were expected to perform their duties in compliance with centralized guidelines and protocols that were set by the recruiting director. [Dkt. 147-10 at 21; Dkt. 147-11 at 3–4].

Recruiters used the Tenstreet application platform to identify potential candidates and also engaged in various in-person recruiting opportunities. [Dkt. 147-4 at 16, 18–19; Dkt. 147-13 at 8; Dkt. 147-16 at 9]. The Tenstreet platform functions as an aggregator, collecting potential candidate information from an array of public sources including job boards, referrals, and in-person recruiting engagements. Each recruiter is responsible for a list of candidates in Tenstreet. Recruiters were expected to contact their candidates to help develop them into more viable candidates. [Dkt. 147-13 at 15, 22; Dkt. 147-7 at 21; Dkt. 147-16 at 19]. These calls operate as a way for Gypsum to share information about the company with a potential applicant and

[2] The record also indicates that Dan Henderson, Vice President of Logistics, held a role in the management of recruiting after Zimmerman's departure.

to formally encourage them to apply, or—if they had already done so—to ensure the application was both complete and up to date. [Dkt. 147-16 at 19; Dkt. 147-10 at 13; Dkt. 147-13 at 15, 23; Dkt. 147-7 at 24, 71–72; Dkt. 147-17 at 7]. Any candidate with a Class A commercial driver's license was considered for a flatbed position, regardless of whether the candidate indicated an interest in such work. [Dkt. 147-7 at 72].

Once a candidate demonstrated a sufficient indicium of interest, the candidate's application would be processed. [Dkt. 147 at 11]. Processing the application generally included the retrieval of essential information, including the applicant's driving record, job history, and a criminal background check. [Dkt. 147-16 at 18–19; Dkt. 147-10 at 13]. At the conclusion of processing, a candidate was either automatically deemed "qualified" if nothing disqualifying appeared during processing, or the recruiter could seek approval to hire an applicant despite the presence of some disqualifying characteristic. [Dkt. 147-16 at 15; Dkt. 147-10 at 13]. Although recruiters first checked with the recruiting manager for this determination, the ultimate authority for making such exceptions rested with Sheppard. [Dkt. 147-10 at 22; Dkt. 147-8 at 9]. Qualified applications then moved to the final steps in the process, which involved the extension of the offer and onboarding. Initially, a recruiter could make the job offer directly to the applicant and begin the orientation and training process. [Dkt. 147-10 at 13; Dkt. 147-2 at 5]. But beginning in September 2017, the recruiter was instead required to forward the application to the relevant terminal manager to conduct an additional interview with the applicant. [Dkt. 147-10 at 13; Dkt. 147-16 at 15]. If the terminal manager approved the

applicant at the interview, the recruiter would then be authorized to begin the orientation and training process. [Dkt. 147-16 at 15–16].

Although Gypsum did not maintain a minimum experience requirement during the relevant period, it did adopt a set of "minimum hiring standards" that outlined a number of disqualifying factors that would initially rule out an applicant during processing. While Gypsum acknowledges that these standards fluctuated over time, they generally set forth guidance for recruiters in several key areas, including: (1) how far a candidate could live from the closest Gypsum terminal; (2) the number of years that must have passed since a DUI or drug conviction; (3) the number of jobs a candidate had in the 3–5 years preceding his or her application; (4) the number of moving violations committed by the candidate; (5) the number of accidents involving the candidate; and (6) the candidate's driver's safety record from the Federal Motor Carrier Safety Administration (FMCSA). [Dkt. 135-1 at 15; Dkt. 135-21]. Despite the existence of these standards, the record indicates that adherence thereto varied over time, often in relation to Gypsum's hiring needs at the time. [Dkt. 75-2 at 2; Dkt. 75-3 at 6; Dkt. 147-9 at 3-4; Dkt. 147-10 at 15, 21; Dkt. 147-13 at 17; Dkt. 147-17 at 8].

Inexperienced drivers undertook Gypsum's training program as a part of their orientation and onboarding process. Due to the bulk of Gypsum's line of business, a portion of the program requires "over the road" training, by which the new driver obtained requisite hands-on experience. [Dkt. 135-1 at 2, 13; Dkt. 135-6 at 9; Dkt. 135-17 at 5]. The structure of this over-the-road training regime changed over time.

Initially, between January 2014 and early 2016, the training program consisted of a mix of "in-cab" training and "shadow" training along "local" routes. [Dkt. 135-6 at 10; Dkt. 135-18 (training pipeline by experience level); Dkt. 135-17 at 7–11]. Restraining the training to localized routes was necessitated by the fact that Gypsum's fleet of trucks had only a single bunk, preventing longer overnight trips. [Dkt. 135-6 at 10–11; Dkt. 135-17 at 8]. A trainee would begin with the "in-cab" portion of the training, which involved a ride-along in the passenger seat while the trainer operated the vehicle. [*Id.*]. After several weeks of "in-cab" training, a trainee would then receive a truck and flatbed load and would follow behind a trainer who also operated a flatbed trailer load (this was referred to as "shadowing"). [Dkt. 135-6 at 10–11, 14; Dkt. 135-5 at 16; Dkt. 135-17 at 9]. The shadowing portion of the program resulted in a high accident rate, however, which led Gypsum to ultimately reevaluate its training program.

Beginning in June 2016, Gypsum introduced a major overhaul of its training program, prompted by its acquisition of new "double bunk" trucks for training purposes. [Dkt. 135-6 at 14; Dkt. 135-4 at 5–6]. Gypsum eliminated the "shadow" portion of the training program and began sending drivers out together on training assignments that could last multiple days. [*Id.*]. This was made possible by the "double bunk" trucks, which were outfitted with multiple beds in their sleeping cabins and were therefore capable of being shared and occupied by both the trainer and trainee on trips. [*Id.*]. Alongside this new program, Gypsum simultaneously introduced its same-sex trainer assignment policy, whereby a female trainee could

not be trained by a male trainer. Gypsum says that it sought out experienced female drivers to serve as trainers during this time, but to no avail.[3] [Dkt. 134-1 at 6–7; Dkt. 135-1 at 14; Dkt. 135-6 at 25–26]. Likewise, during the period where this program was in place, Gypsum hired zero inexperienced female drivers. [Dkt. 147-2 at 3–4]. This updated program, along with the same-sex trainer assignment policy, continued unabated until September 2017, when Gypsum again modified its training program. [Dkt. 135-6 at 24; Dkt. 135-4 at 10; Dkt. 135-11 at 9]. At this time, the training program began to permit mixed-sex pairings of trainer and trainee, in which the trainer slept in a hotel while the trainee slept in the sleeper cabin of the truck. [*Id.*].

The EEOC's primary contention is that Gypsum maintained a pattern or practice of sex discrimination, specifically with respect to the hiring of inexperienced female flatbed drivers, beginning on or around January 1, 2014, and continuing for an indefinite period thereafter. [Dkt. 147 at 6–7, 13]. The EEOC contends that, during this period, "some managers and recruiters at Gypsum have assumed that women were less capable than men of performing the flatbed job, and this attitude permeated the recruiting department." [Dkt. 147 at 14]. The EEOC provides that while the hiring discrimination reached its most virulent form in the period of June 2016 until September 2017—when the same-sex trainer assignment policy was in place—the company's intentional pattern of discrimination began years prior and has continued after the same-sex trainer program was terminated. The EEOC seeks to

[3] On this point, the EEOC claims that Gypsum "enforced its same-sex trainer policy even though male trainers expressed willingness to train female trainees." [Dkt. 131-1 at 7].

prove, through an array of statistical and anecdotal evidence, that a culture of preference for male applicants permeated across Gypsum's senior leadership and that recruiters were forced to act upon this preference at the direction of senior management. The EEOC seeks to demonstrate that the company's recruitment policy, while facially neutral, resulted in the intentional disparate treatment of female applicants that was so pervasive as to constitute the company's standard operating procedure.[4]

The instant litigation stems from an investigation that began on August 10, 2017, when Sherry Curtis, a Gypsum recruiter, filed a Charge of Discrimination with the EEOC alleging she was retaliated against for raising concerns about the company's policies regarding the hiring of inexperienced female applicants. [Dkt. 131-1 at 2; Dkt. 131-2]. On September 28, 2017, Heather Isaacs, another Gypsum recruiter, likewise filed a Charge of Discrimination, contending that she was subjected to a hostile work environment and constructively discharged by being forced to participate in the allegedly discriminatory recruitment program. [*Id.*]. Upon investigation, the EEOC issued Letters of Determination for Curtis and Isaacs on June 7, 2022. [*Id.*]. These Letters notified Gypsum that the EEOC found reasonable cause to believe Gypsum violated Title VII of the Civil Rights Act of 1964 through its termination of Curtis, its constructive discharge of Isaacs, and by

---

[4] The EEOC also claims that the allegedly discriminatory hiring policy was facially discriminatory during the period of June 2016 through September 2017, while the same-sex trainer assignment policy was in effect. Accordingly, the EEOC seeks summary judgment as to its *prima facie* showing under the *Teamsters* framework on this basis. The merits of this motion are discussed in a later section of this opinion.

engaging in a pattern or practice of sex discrimination since 2014 in its refusal to hire otherwise qualified female applicants as flatbed drivers. [*Id.*]. Upon issuance of the Letters, the EEOC and Gypsum engaged in conciliation, the details of which are discussed further below.

After conciliation efforts proved unsuccessful, the EEOC filed this suit on September 30, 2022, alleging a disparate-treatment-pattern-or-practice-of-hiring-discrimination claim, alongside individual claims regarding Curtis and Isaacs. [Dkt. 1]. The matter was bifurcated on July 24, 2023, by order of Magistrate Judge Edward B. Atkins, in accordance with the framework set forth in *International Brotherhood of Teamsters v. United States*. *See* 431 U.S. 324 (1977); [Dkt. 35]. Following the close of Phase I discovery, the EEOC moved for partial summary judgment as to the Phase I pattern-or-practice claim on January 6, 2026. [Dkt. 131]. Gypsum likewise moved for summary judgment on the same day as to both the pattern or practice claim, as well as the individual claims regarding Isaacs and Curtis. [Dkt. 134; Dkt. 135]. These matters are now fully briefed and ripe for review.

## II. Analysis

### A. Summary judgment standard.

The Court's role at the summary judgment stage is not to "make credibility determinations . . . or resolve [any] material factual disputes." *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013). Instead, all facts must be construed, and all reasonable inferences must be drawn, in favor of the non-movant. *Id.* Viewing the record in this light, the Court must grant summary judgment if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *see also Cellmark, Inc. v. Webster*, Civil Action No. 2:24-cv-00181-SCM-CJS, 2026 WL 1416384, at *7 (E.D. Ky. May 20, 2026) (quoting *Wiley*, 20 F.3d at 224).

**B. The EEOC has satisfied its statutory prerequisites to suit.**

The EEOC first moves for summary judgment as to Gypsum's defense of failure to conciliate, arguing that it met all statutory prerequisites to filing suit in this case. [Dkt. 131-1 at 11–15]. Gypsum, on the other hand, argues that the EEOC failed to meet its conciliation requirement because it failed to provide sufficiently specific information about the nature of the underlying claims, the identity of the claimants, or the quantity of claimants. [Dkt. 148 at 9–11].

An EEOC complaint begins when an employee of the defendant company presents a timely charge to the EEOC. *See EEOC v. Magneti Marelli of Tennessee, LLC*, No. 1:18-cv-00074, 2020 WL 918785, at *7 (M.D. Tenn. Feb. 26, 2020). "Title VII . . . imposes a duty on the EEOC to attempt conciliation of a discrimination charge

prior to filing a lawsuit." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Because "Congress chose '[c]ooperation and voluntary compliance' as its 'preferred means,'" it wrote Title VII to require that the Commission "endeavor to eliminate [an] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." *Id.* (alteration in original) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 228 (1982); § 2000e-5(b) (statutory language)). "Only if the Commission is 'unable to secure' an acceptable conciliation agreement—that is, only if its attempt to conciliate has failed—may a claim against the employer go forward." *Id.* at 486–87 (quoting § 2000e-5(f)(1)).

Even so, the scope of judicial review of the Commission's conciliation process is narrow. *See EEOC v. Ephraim McDowell Health, Inc.*, Civil Action No. 5:24-cv-84-KKC, 2025 WL 1823968, at *4 (E.D. Ky. July 2, 2025) (discussing the narrow scope of review of the EEOC's satisfaction of its pre-suit statutory mandates); *see also Mach Mining,* 575 U.S. at 494 (describing the scope of review as "relatively barebones"). Judicial review is limited solely to verifying "(1) that the Commission has informed the employer about the specific allegation, including 'what the employer has done and which employees (or what class of employees) have suffered as a result,' and (2) that the Commission has 'tr[ied] to engage the employer in some form of discussion (whether written or oral), so as to give the employer an opportunity to remedy the allegedly discriminatory practice.'" *EEOC v. Bass Pro Outdoor World, LLC*, 826 F.3d 791, 804 (5th Cir. 2016) (alteration in original) (quoting *Mach Mining*, 575 U.S. at 494–95). For example, "[a] sworn affidavit from the EEOC stating that it has

performed the obligations noted above but that its efforts have failed will usually suffice to show that it has met the conciliation requirement." *Mach Mining*, 575 U.S. at 494 (citing *United States v. Clarke*, 573 U.S. 248, 254 (2014)). "If, however, the employer provides credible evidence of its own, in the form of an affidavit or otherwise, indicating that the EEOC did not provide the requisite information about the charge or attempt to engage in a discussion about conciliating the claim, a court must conduct the factfinding necessary to decide that limited dispute." *Id.* at 495 (citing *Clarke*, 573 U.S. at 254).

Gypsum argues that "[w]ithout knowledge of the nature or even number of potential claimants, the EEOC effectively denied Gypsum an opportunity to address the specific claims at issue, as required by 42 U.S.C. § 2000e-5 and *Mach Mining*." [Dkt. 148 at 11]. Gypsum further contends that "[h]ere, the underlying Charges of Discrimination identified individual claims for constructive and retaliatory discharge brought by two recruiters, not a systemic or even individual failure-to-hire theory involving an entirely different job position—flatbed driver positions." [*Id.* at 10]. In Gypsum's view, therefore, "[t]he EEOC should be prohibited from seeking monetary relief for claimants it did not identify (and therefore could not have conciliated for) before it initiated suit." [*Id.*].

The Court finds that there is no genuine dispute of material fact that the EEOC satisfied its statutory conciliation duty prior to filing suit. The Letters of Determination provided that the EEOC found reasonable cause to believe Gypsum's conduct violated Title VII by illustrating a "pattern or practice of failing to hire

qualified females for flatbed driver positions nationwide . . . since at least March 2014." [Dkt. 131-2 at 11]. This statement provided Gypsum with "what the employer has done, and which employees (or what class of employees) have suffered as a result," as required by both the statute and *Mach Mining*. *See Mach Mining*, 594 U.S. at 494. Furthermore, the EEOC submitted a sworn affidavit from a senior Commission official[5] noting that after issuing Gypsum Letters of Determination, it "invited [Gypsum] to join with the EEOC in informal methods of conciliation to eliminate the discriminatory practices and to provide appropriate relief." [Dkt. 131-2 at 2, 11–12, 14–15]. The affiant further states that "[b]etween June 7, 2022, and August 12, 2022, the EEOC engaged in communications, both written and oral, with [Gypsum] to provide [Gypsum] the opportunity to remedy the discriminatory practices," which included participation in a conciliation conference on July 7, 2022. [*Id.*]. The affiant finally states that, ultimately, "[t]he EEOC determined that further efforts in conciliation would not result in the EEOC being able to secure from [Gypsum] a conciliation agreement acceptable to the EEOC," and that "on August 12, 2022, the EEOC issued [Gypsum] two Notices of Failure of Conciliation." [*Id.*].

It is of no consequence that the EEOC's letter did not identify each member of the class during conciliation. Neither the identification of class members, nor efforts to conciliate on behalf of each aggrieved individual is required at the conciliation stage. *See Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1200 (9th Cir. 2016)

---

[5] The official in question is Richard Burgamy, Acting District Director of the EEOC's Indianapolis District Office.

("[W]e reject the district court's premise that the EEOC . . . must identify and conciliate on behalf of each individual aggrieved employee during the investigation process prior to filing a lawsuit seeking recovery on behalf of a class."); *see also Magneti Marelli*, 2020 WL 918785, at *7 (same); *Serrano v. Cintas Corp.*, 699 F.3d 884, 904 (6th Cir. 2012) (holding that adequate notice was given for conciliation purposes where "the EEOC provided notice to [the Defendant] that it was investigating class-wide instances of discrimination"). Nor is the EEOC required to provide Gypsum with the complete factual and legal basis underpinning its investigation. *See Mach Mining*, 575 U.S. at 491–95 (rejecting the appellant's argument that the EEOC "must also lay out 'the factual and legal basis for' all its positions, including the calculations underlying any monetary request" during conciliation and prior to suit.

The evidence proffered by the EEOC is sufficient to surpass the low bar set for judicial review of conciliation attempts. At bottom, the Court can only conclude that the EEOC engaged in conciliation discussions with Gypsum. That is what the statute requires, and on a "barebones review," the evidence compels the Court to conclude that this requirement was satisfied. Accordingly, the Court will grant EEOC's partial motion for summary judgment as to this defense.

**C. The EEOC's claims are not time-barred.**

Gypsum next argues, both in its own motion for summary judgment and in response to the EEOC's motion, that the portion of the EEOC's claims involving conduct prior to October 7, 2016, are time-barred. [Dkt. 148 at 27–30; Dkt. 135-1 at

18–22]. In response, the EEOC seeks to apply the continuing-violation doctrine to certain of Gypsum's actions occurring before this date. [Dkt. 131-1 at 22–24; Dkt. 147 at 42–44].

Section 706 of Title VII permits the EEOC to sue on behalf of one or more persons who have been aggrieved by an unlawful employment practice. *See* 42 U.S.C. § 2000e-5(f)(1). Section 707 vests the EEOC with the authority to "investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission." *Id.* at § 2000e-6(e). In other words, while Section 707 endows the EEOC with authority to act upon pattern-or-practice claims, one must still look to Section 706 for key statutory procedural questions, like the relevant statute of limitations for such actions. As relevant here, Section 706 prescribes the following time limitation on filing charges:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

*Id.* at § 2000e-5(e)(1). "[T]he Title VII administrative charge period is functionally equivalent to a statute of limitations." *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393–95 (1982)). Courts routinely apply the 300-day charge-filing limitation to pattern-or-practice claims, not just claims brought on behalf of individuals. *See, e.g.*, *EEOC v. Kaplan Higher Educ. Corp.*, 790 F. Supp. 2d 619, 622–24 (N.D. Ohio 2011); *EEOC v. Global Horizons, Inc.*, 904 F. Supp. 2d 1074, 1093–94 (D. Haw. 2012).

In the Title VII context, the continuing-violations doctrine is an equitable exception to the time limitation of Section 706(e)(1). The Sixth Circuit has recognized that it applies in two circumstances. *Sharpe*, 319 F.3d at 266. First, a continuing violation can be found where the disputed conduct occurred "over a series of days or perhaps years." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). As expansive as that may seem, the *Morgan* Court clarified that such continuing violations are distinguishable from repetitively occurring, yet discrete, acts of discrimination or retaliation, to which the charge-filing limitation regularly applies. *Id.* at 113–15. Further explaining this distinction, the *Morgan* Court stated, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitute a separate actionable 'unlawful employment practice.'" *Id.* at 114. Therefore, the *Morgan* Court limited this application of the doctrine to "hostile environment claims" which "involve unlawful employment

practices that cannot be said to occur on any particular day, but occur over a series of days or years." *Sharpe*, 319 F.3d at 267 (citing *Morgan*, 536 U.S. at 112–15).

The Sixth Circuit, in *Sharpe*, recognized a second category of continuing violations: those "involving a longstanding and demonstrable policy of discrimination," which were "not implicated by *Morgan*." *Sharpe*, 319 F.3d at 268 (citing *Tenenbaum v. Caldera*, Nos. 00–2394, 01–1704, 2002 WL 2026347, at *2 n.3 (6th Cir. Aug. 29, 2002)). "To establish this category of continuing violation, '[plaintiff] must demonstrate something more than the existence of discriminatory treatment in his case.'" *Id.* (citing *Haithcock v. Frank*, 958 F.2d 671, 679 (6th Cir. 1992)). "The preponderance of the evidence must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure." *Id.* at 269 (citing *EEOC v. Penton Indus. Publ'g Co.*, 851 F.2d 835, 838 (6th Cir. 1988)). "Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing 'over-arching policy of discrimination.'" *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1106 (6th Cir. 1995) (quoting *Dixon v. Anderson*, 928 F.2d 212, 217 (6th Cir. 1991)). "Generally this exception is strictly construed and is satisfied only where the defendant has a known policy or rule supporting discrimination." *Austion v. City of Clarksville*, No. 05–6626, 2007 WL 2193597, at *5 (6th Cir. July 31, 2007) (citing *Dixon*, 928 F.2d at 217; *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 408–09 (6th Cir. 1999)).

Insofar as the EEOC can establish a valid pattern or practice claim, the application of the continuing violations doctrine recognized in *Sharpe* applies to prevent any portion of the EEOC's claim from being time-barred. This conclusion is readily forced as a matter of basic logic. The EEOC claim contends that Gypsum maintained a continuous, intentional program aimed at minimizing, or altogether preventing, the hiring of female flatbed drivers. Although the EEOC alleges that this discrimination took different forms—ranging from more tacit forms of discrimination to more overt policy choices (*i.e.*, the same-sex trainer assignment policy)—it nonetheless alleges that the policy was continuous and uninterrupted beginning at least in 2014. And, furthermore, the EEOC contends that this policy originated with senior leadership and trickled down to the day-to-day actions of the recruiters. Likewise, to meet its *prima facie* burden under the *Teamsters* burden-shifting framework—discussed in greater detail below—the EEOC must show that the discrimination was the defendant's standard operating procedure. This is functionally identical to the standard applicable under *Sharpe*. Consequently, the Court finds that if the EEOC can meet its *prima facie* burden under *Teamsters*, it must necessarily be able to invoke the continuing-violations doctrine under *Sharpe* due to the functional similarity underlying both standards.

**D. The EEOC's litigation does not violate Executive Order 14281.**

Gypsum also alleges that the EEOC's continued litigation of the charges in this case are invalid because they violate Executive Order 14281, which dictates that the federal government's policy is "to eliminate the use of disparate-impact liability" and

requires the EEOC to "assess all pending investigations . . . that rely on a theory of disparate-impact liability." Exec. Order. No. 14281, 90 Fed. Reg. 17537 (Apr. 23, 2025). The EEOC counters that the Executive Order is inapplicable because this is a disparate-treatment case rather than a disparate-impact case. [Dkt. 147 at 47–49]. Gypsum, in turn, contends that this is an improper characterization of the nature of this case. [Dkt. 135-1 at 22].

The Court agrees with the EEOC that this case is properly characterized as a disparate-treatment case. Disparate-treatment cases carry a higher burden of proof. "Disparate impact claims involve facially neutral employment practices that have disproportionate impact on protected classes of individuals," while "[d]isparate treatment claims . . . involve intentionally discriminatory employment practices." *Bowdish v. Cont'l Accessories, Inc.*, No. 91–1548, 1992 WL 133022, at *3 (6th Cir. June 12, 1992); *see also United States v. Brennan*, 650 F.3d 65, 89–90 (2d Cir. 2011). "Plaintiffs asserting a disparate-treatment claim must prove discriminatory motive or intent, while plaintiffs asserting a disparate-impact claim need not. *Serrano*, 699 F.3d at 892 (citing *Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995)).

As the EEOC itself makes clear, "[t]he EEOC does not plead a disparate impact theory in its complaint or make any allegations suggesting it intends to demonstrate an adverse impact caused by a facially neutral employment practice," and "here the complaint repeatedly alleges Gypsum's actions were intentional and carried out with malice or reckless indifference to the rights of affected applicants." [Dkt. 147 at 47–48]. The simple fact that the EEOC intends to bring statistical, in addition to

anecdotal, evidence does not somehow convert its claim into one for disparate impact. Disparate-treatment claims come with a higher burden of proof, and the EEOC makes no attempt to shy away from that fact, here or elsewhere in the record. This case is not, as Gypsum suggests, a disparate-impact claim disguised as one for disparate-treatment. The EEOC has consistently maintained that Gypsum's policy was facially discriminatory and attempts to demonstrate that it violates federal law through a combination of both statistical and anecdotal evidence. Accordingly, the EEOC's continued pursuit of this claim does not violate Executive Order 14281.

**E. Neither the EEOC nor Gypsum is entitled to summary judgment on the merits.**

Finally, both EEOC and Gypsum contend they are entitled to summary judgment on the merits, essentially because purported deficiencies in the opposing party's evidence render them incapable of either proving or refuting a key element. Neither one is correct.

"[I]n *International Brotherhood of Teamsters v. United States*, the Supreme Court set forth the pattern-or-practice method as an alternative means of establishing a *prima facie* case for an employment discrimination claim."[6] *Williams v. Dearborn Motors 1, LLC*, No. 20-1351, 2021 WL 3854805, at *5 (6th Cir. Aug. 30, 2021) (citing *Teamsters*, 431 U.S. at 358). Under this burden-shifting framework, the

[6] This is akin to, but distinct from, the three-part burden-shifting framework laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, which applies exclusively to private, non-class action employment discrimination suits brought under Title VII. *See* 411 U.S. 792, 800 (1973).

EEOC (or the plaintiff class)[7] must prove a *prima facie* case by demonstrating "that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360; *see also Dillon v. Coles*, 746 F.2d 998, 1004 (3d Cir. 1984) ("[T]he class representative's *prima facie* case must establish that discrimination was the employer's standard practice." (citations omitted)); *Sperling v. Hoffman-La Roche, Inc.*, 924 F. Supp. 1346, 1358 (D.N.J. 1996) ("[A] company engages in a pattern or practice of discrimination when it systematically engages in intentional discrimination against a protected group, or in other words, when it maintains a regular, corporate policy of purposeful discrimination in some aspect of its employment practices." (citations omitted)). "Upon that showing, it is assumed 'that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy' and, therefore, '[t]he [plaintiff] need only show that an alleged individual discriminatee unsuccessfully applied for a job.'" *Serrano*, 699 F.3d at 893 (alteration in original) (quoting *Teamsters*, 431 U.S. at 362). "The burden then shifts to the employer to defeat the *prima facie* showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360. Generally, to defeat such a showing, the defendant employer must "demonstrate that the individual applicant was denied an employment opportunity

[7] "The pattern-or-practice method is available only in class actions or suits by the government." *Williams v. Dearborn Motors 1, LLC*, No. 20-1351, 2021 WL 3854805, at *5 (6th Cir. Aug. 30, 2021) (citing *Bacon v. Honda of Am., Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004)).

for lawful reasons." *Id.* at 362 (citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 773 (1976)).

"Both *McDonnell Douglas* and *Teamsters* provide frameworks through which a plaintiff can prove intentional discrimination through circumstantial evidence." *Serrano*, 699 F.3d at 892 (citations omitted); *see also Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 183 (3d Cir. 2009) ("The *Teamsters* framework was judicially promulgated as a method of proof for pattern-or-practice claims brought by the government under Title VII, as that statute authorizes—it provides a means by which courts can assess whether a particular form of statutorily prohibited discrimination exists, just as the *McDonnell Douglas* framework does for individual claims of disparate treatment."); *Ekanem v. Health & Hosp. Corp. of Marion Cnty., Ind.*, 724 F.2d 563, 575 (7th Cir. 1983) ("The 'pattern or practice' theory of proof set forth in *Teamsters* and its progeny affords plaintiffs wide latitude in attempting to establish circumstantial evidence of unlawful intent.").

The remainder of the Parties' cross-motions relate to this critical first phase of the *Teamsters* burden shifting framework—whether the EEOC has, or could, make their requisite *prima facie* showing that Gypsum engaged in a pattern or practice of employment discrimination. The EEOC contends, by reference to other cases, that it has made the requisite showing for the period of June 2016 through September 2017, because, in its view, Gypsum's policy was facially discriminatory during this time. Gypsum, on the other hand, raises several arguments to claim that the EEOC is unable to make its *prima facie* showing as a matter of law. First, it contends that

because the EEOC's own motion was not accompanied by a statistical analysis, it must be denied. Additionally, as to the merits, Gypsum takes issue with the sufficiency, foundation, and relevance of the EEOC's statistical and anecdotal evidence, and it posits that the EEOC is unable to demonstrate its *prima facie* case as a matter of law. For the reasons that follow, each of these arguments falls short and, ultimately, the cross-motions will be denied as to the merits of the case.

1. <u>The alleged lack of statistical evidence supporting the EEOC's motion.</u>

First, Gypsum contends that "[t]he EEOC's motion should be denied because it lacks the type of rigorous statistical analysis that courts require to establish a pattern or practice of discrimination at the liability phase." [Dkt. 148 at 11]. In other words, the EEOC is arguing that it is entitled to a partial summary judgment finding that Gypsum engaged in a patter or practice of sex discrimination from June 1, 2016 to September 17, 2017, and Gypsum is simply arguing that the EEOC is not entitled to judgment as a matter of law on that point because the EEOC's motion for partial summary judgment is not supported by sufficient statistical evidence. Ultimately, this dispute is irrelevant. The Court need not determine whether—or how much—statistical evidence would be needed to entitle the EEOC to an offensive summary judgment because the Court concludes that genuine issues of material fact preclude summary judgment for either party. Furthermore, to the extent Gypsum is arguing that it is entitled to summary judgment due to a lack of statistical evidence supporting the EEOC's claims, Gypsum is plainly wrong. There is a plethora of statistical evidence here, as demonstrated by the discussion below. Gypsum objects

to the admissibility of that evidence—see the contemporaneously filed opinion on the parties' respective *Daubert* motions—and also disputes the probative value of that evidence, but the evidence nevertheless exists, and the Court has not excluded it.

2. The alleged lack of statistical evidence generally.

Turning next to the merits of the case, Gypsum argues that the findings and conclusions of the EEOC's expert witness, Dr. Erich Cromwell, fail to establish a pattern or practice of discrimination on its part. [Dkt. 135-1 at 25–35]. This is the real dispute over the statistical evidence, and it is materially and functionally identical to Gypsum's *Daubert* motion. A Memorandum Opinion & Order addressing, and ultimately denying, this motion is entered contemporaneously with this Order. [*See* Dkt. 197]. The Court need not belabor this issue further here. As the Court summarized in that Opinion, "[w]hile Gypsum may have presented reasons to criticize the credibility of Dr. Cromwell's opinion, they are not grounds to exclude his testimony." [Dkt. 197 at 25]. The same logic applies here. In essence, Gypsum seeks summary judgment, in part, by stating that the statistical evidence is flawed, and as discussed in more detail below, that the anecdotal evidence presented, standing alone, is insufficient. The Court disagrees for the reasons set forth in the separate opinion and order denying Gypsum's *Daubert* motion. [*See* Dkt. 197]. It will be for the jury to decide whether to ascribe significant weight to Dr. Cromwell's analysis, in view of the testimony as well as the testimony of Gypsum's own proffered expert, Dr. Song. The Court will not, however, exclude this scientific analysis at this juncture. Nor will the Court conclude that Gypsum's arguments regarding this evidence entitle

Gypsum to summary judgment. At bottom, the critiques of Dr. Cromwell's analysis amount to a dispute over the credibility of his analysis, and these questions must ultimately be resolved by the jury.

3. <u>Prima Facie Case</u>

*i. The EEOC's prima facie case does not fail as a matter of law.*

Gypsum likewise contends that the EEOC's anecdotal evidence fails to adequately support its *prima facie* case. [Dkt. 148 at 11–14]. In essence, this argument goes hand-in-hand with Gypsum's aforementioned position regarding the EEOC's statistical evidence. Gypsum theorizes that because, in its view, the EEOC's statistical evidence is scientifically flawed, the importance and weight ascribed to the anecdotal evidence is proportionally heightened. It further posits that the anecdotal evidence the EEOC presents cannot possibly meet this elevated standard. This argument ultimately falls short, however, because determining the sufficiency of this evidence, in combination with the scientific evidence discussed above, will ultimately be the prerogative of the jury. And, furthermore, "[a]necdotal evidence, such as this, is useful to demonstrate that the statistical disparities are the result of intentional discrimination, and not the result of nondiscriminatory factors." *Sperling*, 924 F. Supp. at 1383 (citing *Teamsters*, 431 U.S. at 339) ("The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life.").

Nevertheless, Gypsum contends that the EEOC has identified an inadequate number of aggrieved individuals to formulate its class. [Dkt. 135-1 at 37–40]. More

specifically, Gypsum argues that the EEOC's *prima facie* case is undercut by the fact it identified only two women who claim they were denied employment during the period in which Gypsum did not pair mixed-gender trainers and trainees for over-the-road training. [*Id.* at 37–38]. It further argues that the EEOC could also only identify two other women who were denied employment prior to the time in which Gypsum required same-sex training partners. [*Id.* at 38]. Gypsum also states that the EEOC's five other identified witnesses "contribute little to no substantive anecdotal evidence of discrimination" either because the applicant was objectively unqualified or otherwise ineligible for the position, or because she applied after Gypsum had modified its training program. [*Id.* at 39]. Taken together, Gypsum argues that this small sample size entirely disarms the EEOC's ability to demonstrate that discrimination amounted to Gypsum's standard operating procedure.

While it certainly might be the case that the number of aggrieved applicants identified by the EEOC, standing alone, would fall short of proving a pattern or practice of discrimination, it is vital to remember that this is but one component of the EEOC's case. The EEOC does not shy away from the number of aggrieved applicants it has identified but notes that the "use of the applicants' testimony is not to prove Gypsum's discriminatory *intent*, but instead to show that the policy was implemented—i.e., that the company actually denied female applicants as a result of the policy." [Dkt. 147 at 38]. In other words, the identified individuals are intended to serve as exemplars to demonstrate that the discriminatory policy was actually implemented. Unlike the cases Gypsum cites, this is not a case in which the plaintiff's

entire *prima facie* cases rests solely on the existence of this sort of anecdotal proof. Questions about the credibility of these applicant-witnesses, as well as the probative value of any information they provide as testimony, are questions for the jury to resolve at trial. In short, pointing to the quantity of aggrieved applicants who the EEOC intends to call as witnesses does not undermine the EEOC's case as a matter of law.

Gypsum next posits that the EEOC's case "wholly disregards the challenges which Gypsum faced when trying to hire female flatbed drivers." [Dkt. 135-1 at 41]. To this effect, Gypsum states that "[m]ost commercial drivers (male and female) have no interest in ever working as flatbed drivers[,]" and "[t]he record evidence also confirms that female flatbed drivers struggled and voluntarily left due to the physical challenges of the position." [*Id.*]. Gypsum further contended that "despite the overall resistance among female applicants to become flatbed drivers, Gypsum made targeted, concrete efforts to hire and retain female drivers," and Gypsum specifically cites an example of a female applicant who was hired in April 2019 "despite having a less than perfect background." [*Id.* at 41–42].

Again, this evidence does not undermine the EEOC's *prima facie* case as a matter of law, especially not when construed in a light most favorable to the non-movant. The fact that Gypsum ultimately ended the allegedly discriminatory policy and began to hire women to these positions does not offset any discrimination that might have occurred in prior years. *See Teamsters*, 431 U.S. at 341–42 ("The company's later changes in its hiring and promotion policies could be of little comfort

to the victims of the earlier post-Act discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it." (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 413–23 (1975))). Even supposing, for the sake of argument, that Gypsum hired women during the period in which the EEOC claims a pattern or practice of discrimination occurred, that alone does not necessarily undermine the EEOC's claim. The standard requires only that the discriminatory practice comprise the defendant's standard operating procedure, requiring a correspondingly high degree of pervasiveness. This is undoubtedly a demanding showing, but not a question of absolutes. And, again, this is a question for the jury to decide.

Gypsum further attempts to excuse its conduct, as a matter of law, by stating that it "was actively trying to find female trainers or other alternatives to Gypsum's training program." [Dkt. 135-1 at 42]. Gypsum essentially argues that because it made efforts to recruit a female trainer from among its corps of experienced female drivers, this undercuts the EEOC's *prima facie* case. This is akin to Gypsum's other argument contending that the EEOC's position "cannot be reconciled with the total absence of any evidence of discrimination against other women at . . . Gypsum." [*Id.*]. Once more, this argument is one to be made to the jury and does not enervate the EEOC's claim as a matter of law. *See, e.g.*, *United States v. Lansdowne Swim Club*, 713 F. Supp. 785, 907 (E.D. Pa. 1989), *aff'd* 894 F.2d 83 (3d Cir. 1990) ("A pattern or practice of discrimination may be found even if a defendant does not discriminate uniformly." (citing *United States v. Ironworkers Local 86,* 443 F.2d 544, 552 (9th Cir.);

*United States v. Real Estate Dev. Co.,* 347 F. Supp. 776, 783–84 (N.D. Miss.1972))). At any rate, Gypsum's claim that it did not discriminate against women in the hiring of experienced drivers is factually disputed. There is ultimately no need to address the materiality of this question at this point because, ultimately, the weight of the evidence will be determined by the jury at trial.

Gypsum next argues that its "decentralized hiring structure" precludes any finding that it engaged in a pattern or practice of employment discrimination. [Dkt. 135-1 at 43]. Here, Gypsum asserts that its "driver hiring decisions . . . were decentralized-final hiring decisions rested with the terminal managers at the local level." [*Id.*]. Consequently, in Gypsum's view, because the hiring decisions rested primarily at the local level, the broader Gypsum Express enterprise cannot be held liable for promulgating a pattern or practice of discrimination. [*Id.* at 44]. Once again, this assertion is the subject of a genuine factual dispute.

In contrast to Gypsum's characterization of its hiring structure, the EEOC contends, with supporting evidence, that "[o]ver the period at issue, terminal managers played shifting roles in the hiring process." [Dkt. 147 at 43]. Specifically, the EEOC seeks to prove at trial that the recruiters housed within a "centralized recruiting department" played an essential role in implementing the discriminatory policy through their decisions of whether to advance female leads and applicants. [*Id.*]. The case upon which Gypsum centrally relies on this point—*Sperling v. Hoffman La Roche, Inc.*—is factually distinguishable from the present case. For instance, *Sperling* involved an allegation of widespread discrimination in conjunction

with a singular event, the employer's reduction in force. *See Sperling*, 924 F. Supp. at 1349. Also, and particularly relevant on this point, the plaintiffs in *Sperling* alleged that the discriminatory decisions were made by lower-level managers who possessed "virtually complete discretion" and that "their decisions were not subject to review by Roche's higher level managers." *Sperling*, 924 F. Supp. at 1395. Here, by contrast, the EEOC substantively alleges that the centralized recruitment office maintained a high degree of control over the alleged discriminatory practice in hiring. [Dkt. 147 at 43–45]. As an additional matter, as the EEOC points out, the sheer fact that an employer's hiring process is "decentralized" does not preclude a finding that they have nonetheless engaged in a pattern or practice of discrimination. [*Id.*]. But, of course, all of this presents a question of fact for the jury to resolve.

Finally, Gypsum additionally argues that because "[e]mployers do not have a duty under Title VII to ameliorate uncaused workforce imbalances[,]" the EEOC "cannot satisfy its *prima facie* burden by pointing to disparities in Gypsum's workplace." [Dkt. 135-1 at 35]. Gypsum opines that "a disparity between those in a protected class and those outside a protected class is insufficient to establish Title VII liability." [*Id.* at 36]. In support of this assertion, Gypsum quotes an Eleventh Circuit opinion that provides:

> [H]olding employers liable for statistical imbalances *per se* is inconsistent with Title VII's plain language and statutory purpose . . . . [I]f employers could be held liable for an unlawful disparate impact on account of statistical workforce imbalances per se, then they would be forced to use numerical quotas and other forms of preferential treatment in their hiring and promotion policies, in express contravention of Title VII, in order to insulate themselves from the potential legal liability that would arise if their workforce demographics did not closely mirror the

demographics of their surrounding community or local competitors. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1276 (11th Cir. 2000). Aside from the fact that *Joe's Stone Crab* dealt with a disparate-impact claim, its rationale does not move the needle in the dispute before the Court.[8] While statistical disparities alone might be insufficient to demonstrate a Title VII violation, the EEOC's case here is built upon a combination of statistical and anecdotal evidence. This means, in practical effect, that Gypsum would not be held liable solely because its workforce contains certain "imbalances" that do not reflect the demographics of the population writ large. As the EEOC itself states, it "does not contend that Gypsum's workforce should match the demographics of surrounding metropolitan areas or even of the number of women in the trucking industry." [Dkt. 147 at 36]. Thus, Gypsum's argument in this respect is largely irrelevant, and certainly does not entitle it to judgment as a matter of law.

ii. *The Court cannot conclude that the EEOC's prima facie case necessarily succeeds as a matter of law.*

The EEOC contends that it is entitled to partial summary judgment as to a portion of its *prima facie* case, specifically the period from June 2016 through

[8] Gypsum also cites *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948 (8th Cir. 1999), for this proposition. Unlike *Joe's Stone Crab*, this *McDonnell Douglas* case involved a disparate-treatment claim. The court there held that "the EEOC's statistical evidence, standing alone, is insufficient to establish a *prima facie* case." *Id.* at 952. The reason the statistical evidence was standing alone, however, was because the court discounted the anecdotal evidence as demonstrating "at most, isolated discriminatory acts on the part of certain managers, rather than [its] 'standard operating procedure.'" *Id.* (citing *Teamsters*, 431 U.S. at 336). *McDonnell Douglas* is inapposite here because the EEOC sets forth a more robust framework of anecdotal evidence, meaning that its statistical analysis does not, or will not, stand alone.

September 2017 when the same-sex trainer assignment policy was in place, because it contends that Gypsum's policy was facially discriminatory. [Dkt. 131-1 at 16–24]. In support of this assertion the EEOC relies primarily upon another district court case—*EEOC v. New Prime, Inc.*, 42 F. Supp. 3d 1201 (W.D. Mo. 2014)—in an attempt to draw parallels to the present dispute. [*Id.* at 18]. The EEOC asks this Court to follow suit by likewise granting summary judgment in its favor on this portion of its *prima facie* case. In short, while Gypsum's primary argument is that the EEOC cannot possibly meet its *prima facie* burden under *Teamsters*, the EEOC argues in its own motion that it has already done so as a matter of law, at least for the June 2016 to September 2017 period. The Court disagrees.

The EEOC primarily contends that Gypsum's same-sex trainer policy was facially discriminatory and, consequently, it is entitled to summary judgment as to its *prima facie* burden under the *Teamsters* framework for the specified timeframe. In making this assertion, the EEOC relies principally upon the district court opinion in *New Prime*. While the underlying facts of *New Prime* are somewhat similar to those at issue in this case, the question of whether the EEOC had sufficiently demonstrated its *prima facie* showing was not squarely before the *New Prime* court. The *New Prime* employer "implemented a 'same-sex trainer policy,'" which "required all applicants who do not meet [the defendant's] experience requirements to receive over-the-road training by an instructor and/or trainer who is the same gender as the applicant unless there is some pre-existing relationship between the female applicant and male instructor/trainer." *Id.* at 1206.

The cases diverge, despite the similarities in their underlying programs, based upon the presence of substantial factual disputes in the present matter that do not appear to have been at the fore in *New Prime*. The *New Prime* court concluded, succinctly and without much elaboration, that the defendant employer's program was both facially discriminatory and the company's standard operating procedure. *Id.* at 1212–13. The court reached this conclusion by comparing the policy before it to one invalidated by the Supreme Court in *International Union, UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), in which "[f]ertile men, but not fertile women [were] given a choice as to whether they wish to risk their reproductive health for a particular job," and thus, "[the defendant's] fetal-protection policy explicitly discriminate[d] against women on the basis of their sex." *Id.* (quoting *Johnson Controls*, 499 U.S. at 197). With *Johnson Controls* as reference, the *New Prime* court then concluded, upon the facts before it, that "the policy is facially discriminatory, much like the policy in *Johnson Controls*, in that it places limitations on the opportunities for female applicants to be trained versus men." *Id.* at 1213. The court further noted that, "[t]his was no small impediment but one which could require women to remain on the waiting list for a year or more while men faced no such delay." *Id.* Therefore, the court summarily concluded that the defendant's "same sex policy was the company's standard operating procedure and is facially discriminatory resulting in disparate treatment of female applicants and drivers." *Id.*

The *New Prime* court's focus then shifts to the question more centrally before it: "whether the employer can provide an affirmative defense to permit the policy,"

specifically whether the employer is entitled to the bona fide occupational qualification ("BFOQ") defense. *Id.* This was the primary nucleus of the court's opinion, and the primary disagreement among the parties. In other words, the *New Prime* court expediently addressed the plaintiff's largely uncontroverted *prima facie* case before shifting the burden to the defendant, with the adequacy of the *defendant's* showing being the primary issue before the court. The record does not indicate that the *New Prime* court was faced with significant factual disputes, with both the statistical and anecdotal evidence no less, as is the case before this Court. Where the defendant practically concedes the plaintiff's *prima facie* burden and instead rests its entire liability-phase argument upon its own burden of demonstrating the applicability of the bone-fide-occupational-qualification defense, it is no surprise that the court easily found that the EEOC met its burden under the *Teamsters* framework. That is not the case before the Court today. Although the *New Prime* court may certainly have been able to find the plaintiff's *prima facie* burden readily satisfied with the facts before it, it would be inappropriate for this Court to do so where the plaintiff's *prima facie* case is riddled with factual disputes better suited for the jury. Consequently, the Court cannot find that the EEOC has demonstrated its entitlement to judgment as a matter of law and will deny its motion on this basis.

Furthermore, the *New Prime* court incorrectly concluded that a same-sex trainer policy is facially discriminatory. The same-sex trainer assignment policy at issue here is not facially discriminatory under the standard set forth in *Johnson Controls*. The policy at issue in *Johnson Controls*—the so-called "fetal-protection"

policy—applied expressly to women "capable of bearing children" to prevent their exposure to lead at a battery manufacturing plant. *Johnson Controls*, 499 U.S. at 192. The defendant company in *Johnson Controls* imposed a policy that, by its text, excluded fertile women from engaging in certain categories of work on the basis of their sex, as well as their fertility. Specifically, the policy at issue in *Johnson Controls* stated:

> [I]t is [Johnson Controls'] policy that women who are pregnant or who are capable of bearing children will not be placed into jobs involving lead exposure or which could expose them to lead through the exercise of job bidding, bumping, transfer or promotion rights.

*Id.* (alteration in original). "The policy defined 'women . . . capable of bearing children' as '[a]ll women except those whose inability to bear children is medically documented.'" *Id.* (alteration in original). Gypsum's same-sex trainer assignment policy, by contrast, does not facially exclude a protected category of persons from participation in workforce activity. Rather, it required only that inexperienced females be trained by a female trainer, with an identical corresponding requirement for males. On its face, this does not exclude women from receiving training as flatbed drivers in Gypsum's program. In other words, the policy—on its face—does not single women out for "distinctions or differences in treatment that injure [them]." *Bostock v. Clayton County, Ga.*, 590 U.S. 644, 681 (2020) (quoting *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 59 (2006)). Under the terms of the policy, women are not excluded from access to training; men and women both have equal access to training on the face of the policy.

Only when the result is revealed—that Gypsum employed no female trainers and, therefore, did not hire inexperienced female drivers—does the potentially discriminatory nature of the policy come to the fore. In other words, to find any alleged discriminatory harm from the policy, one must look beyond the terms of the policy to see how it was actually implemented. By definition, this means that the policy is not discriminatory on its face. Rather, it was a neutral policy that neither benefited not discriminated against either sex. If accepted by the jury, the allegation that the policy was carried out in a discriminatory manner—*i.e.*, by intentionally not hiring female trainers and therefore not allowing the hiring of female trainees—will likely be enough to establish that unlawful discrimination was the "regular procedure or policy" of the company. *Teamsters*, 431 U.S. at 360. But the policy itself does not establish that; it is only when one looks to the manner in which the policy was implemented that one can find discrimination. So the discriminatory intent and effect of the policy will be questions for the jury.

At bottom, the EEOC can make out its *prima facie* case, but it has not yet done so as a matter of law. As discussed at length above, this case is rife with genuine issues of material fact as to both the statistical and anecdotal evidence before the Court. Factual disputes require resolution by the trier of fact. The question of whether the EEOC has satisfied its *prima facie* burden will be one for the jury, based upon the statistical and anecdotal evidence validly put before it at trial. And, if the EEOC satisfies its *prima facie* burden at trial, Gypsum will likewise bear the burden of rebutting the EEOC's *prima facie* case. Both sides will have to present their

respective cases to a jury. At this juncture, there is not a valid basis for the Court to take the dispute away from the jury and decide it in favor of either party as a matter of law.

## III. Conclusion

For these reasons, it is hereby **ORDERED** as follows:

1. The EEOC's Motion for Partial Summary Judgment, [Dkt. 131], is **GRANTED in part**, and **DENIED in part**;
2. Gypsum's Motion for Summary Judgment, [Dkt. 135], is **DENIED**;
3. The EEOC's Motion for Leave to File a Surreply, [Dkt. 166], is **DENIED**.

Signed this 29th day of September 2026.

S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky