UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at Frankfort

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GYPSUM EXPRESS, LTD.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:22-cv-00061-SCM-EBA<br><br>**MEMORANDUM OPINION AND ORDER** |

*** *** *** ***

Defendant Gypsum Express, Ltd., has moved for summary judgment on the EEOC's claims of retaliation, adverse employment conditions, and constructive discharge regarding two of Gypsum's previous employees. [Dkt. 134].[1] For the reasons that follow, this Motion is granted in part and denied in part.

## I. Facts

Gypsum Express, Ltd., is a regional transportation-for-hire company with a primary focus on flatbed freight transportation. John Wight is the CEO, founder, and owner of Gypsum. [Dkt. 147-5 at 3]. Tim Sheppard became Gypsum's President in 2025 and has served as Vice President of Flatbed Operations since 2013. [Dkt. 147-8 at 6].

---

[1] Gypsum has filed a separate motion for summary judgment on the EEOC's claim that Gypsum has engaged in a pattern or practice of discrimination. That motion is addressed in a separate opinion.

Gypsum hired flatbed drivers through the work of a team of between three and eight recruiters. [Dkt. 147-8 at 9; Dkt. 147-7 at 7]. All but one of these recruiters at any given time were dedicated entirely to the recruitment of flatbed drivers. [Dkt. 147-7 at 10; Dkt. 147-8 at 11]. The various recruiters reported to various recruitment managers, including Recruiting Director Dale Zimmerman between October 2013 and April 2017 and Recruiting Manager Tammy Moss between April 2018 and July 2019. [Dkt. 147-7 at 6; Dkt. 147-13 at 11, 28; Dkt. 147-8 at 10]. Zimmerman reported directly to Sheppard and regularly communicated with both Sheppard and Wight about recruiting activities. [Dkt. 147-7 at 7; Dkt. 146-6 at 8]. At all times, recruiters were expected to perform their duties in compliance with centralized guidelines and protocols that were set by the recruiting director. [Dkt. 147-10 at 21; Dkt. 147-11 at 3–4]. Ultimately, all flatbed recruitment and training was overseen by Sheppard. [Dkt. 146-4 at 6, 9].

Inexperienced drivers undertook Gypsum's training program as a part of their orientation and onboarding process. Due to the bulk of Gypsum's line of business, a portion of the program required "over the road" training, by which the new driver obtained requisite hands-on experience. [Dkt. 135-1 at 2, 13; Dkt. 135-6 at 9; Dkt. 135-17 at 5]. The structure of this over-the-road training regime changed over time. Initially, between January 2014 and early 2016, the training program consisted of a mix of "in-cab" training and "shadow" training along "local" routes. [Dkt. 135-6 at 10; Dkt. 135-18 (training pipeline by experience level); Dkt. 135-17 at 7–11]. Restraining the training to localized routes was necessitated by the fact that Gypsum's fleet of

trucks had only a single bunk, preventing longer overnight trips. [Dkt. 135-6 at 10–11; Dkt. 135-17 at 8]. A trainee would begin with the "in-cab" portion of the training, which involved a ride-along in the passenger seat while the trainer operated the vehicle. [*Id.*]. After several weeks of "in-cab" training, a trainee would then receive a truck and flatbed load and would follow behind a trainer who also operated a flatbed trailer load (this was referred to as "shadowing"). [Dkt. 135-6 at 10–11, 14; Dkt. 135-5 at 16; Dkt. 135-17 at 9]. The shadowing portion of the program resulted in a high accident rate, however, which led Gypsum to ultimately reevaluate its training program.

Beginning in June 2016, Gypsum introduced a major overhaul of its training program, prompted by its acquisition of new "double bunk" trucks for training purposes. [Dkt. 135-6 at 14; Dkt. 135-4 at 5–6]. Gypsum eliminated the "shadow" portion of the training program and began sending drivers out together on training assignments that could last multiple days. [*Id.*]. This was made possible by the "double bunk" trucks, which were outfitted with multiple beds in their sleeping cabins and were therefore capable of being shared and occupied by both the trainer and trainee on trips. [*Id.*]. Alongside this new program, Gypsum simultaneously introduced its same-sex trainer assignment policy, whereby a female trainee could not be trained by a male trainer. Gypsum says that it sought out experienced female drivers to serve as trainers during this time, but to no avail. [Dkt. 134-1 at 6–7; Dkt. 135-1 at 14; Dkt. 135-6 at 25–26]. Likewise, during the period where this program was in place, Gypsum hired zero inexperienced female drivers. [Dkt. 147-2 at 3–4].

This updated program, along with the same-sex trainer assignment policy, continued unabated until September 2017, when Gypsum again modified its training program. [Dkt. 135-6 at 24; Dkt. 135-4 at 10; Dkt. 135-11 at 9]. At this time, the training program began to permit mixed gender pairings of trainer and trainee, in which the trainer slept in a hotel while the trainee slept in the sleeper cabin of the truck. [*Id.*]

Maxine Sears-Cornelious served as Director of Orientation and Training from September 2016 until June 2018 and reported directly to Sheppard. [Dkt. 147-14 at 3, 9, 13]. Human Resources Director Adrienne Deloff worked in the corporate office with Wight and communicated with him about personnel matters that should be escalated to his attention, including issues of alleged discrimination. [Dkt. 146-1 at 5–6; Dkt. 146-5 at 4]. Michelle Carney served as Regional Human Resources Manager from July 2016 to July 2017 and reported directly to Deloff. [Dkt. 146-7 at 4–6].

### A. Chris Curtis.

Sherry "Chris" Curtis began working as an administrative assistant in the operations department at the Michigan City terminal on or around April 1, 2014. [Dkt. 146-8 at 5, 7]. In that role, she reported to Terry Killingbeck, the terminal manager of Gypsum's Michigan City, Indiana Terminal. [*Id.* at 7].

On November 2, 2015, Curtis moved from operations to recruiting, where she reported to Zimmerman. [Dkt. 146-8 at 23, 95]. While other recruiters were assigned to multiple terminals, Curtis was assigned to only one: the Vanlue, Ohio terminal.

[Dkt. 146-8 at 8; Dkt. 146-6 at 29]. Being one of Gypsum's smaller operations, the Vanlue terminal did not generate much revenue. [Dkt. 146-6 at 70; Dkt. 146-4 at 38].

Curtis's performance reviews for her time in recruiting were, at best, mixed. In Zimmerman's April 29, 2016 review, he noted that Curtis performed satisfactorily in most areas of assessment. [Dkt. 146-8 at 100–01]. Zimmerman's October 20, 2016 review stated the same, but noted that she had still not yet reached her goal of hiring 1 driver per week. [Dkt. 146-8 at 102–03]. Zimmerman noted, however, that she had areas for improvement; for example, she needed to work on paying more attention to driver applications and retaining information. [*Id.* at 101]. She received a pay rise of $2,500 on October 21, 2016. [Dkt. 146-9 at 2]. But in April 2017, Zimmerman had concerns about Curtis's performance and whether she could keep up, concerns he did not have about other recruiters. [Dkt. 134-13 at 21–22]. Curtis was never able to recruit at least 1 driver per week. [*Id.* at 26–27]. Between December 16, 2016, and May 17, 2017, she successfully recruited only 12 drivers to Gypsum. [Dkt. 134-24 at 2].

Although Gypsum's other recruiters, all of whom were assigned more than one terminal, all successfully recruited more drivers than Curtis, [*id.*], Gypsum had concerns about their performance as well. For example, Deb Casias did not meet her goals for her terminals. [Dkt. 146-10 at 10]. In Heather Isaacs's November 2016 evaluation, Zimmerman described her performance as "unacceptable," noting that she had fallen "way short" of her goals. [Dkt. 146-13 at 130–31]. In January 2017,

Wight verbally chastised Casias, Isaacs, and Smith about their recruiting numbers for 2016. [*Id.* at 37; Dkt. 146-10 at 10–11; Dkt. 146-11 at 10–11].

In July or August 2016, Curtis met Tina Allen, a female driving school student, while recruiting at the Williamsburg driving school. [Dkt. 146-8 at 24, 27]. Allen applied to Gypsum and reached out to Curtis repeatedly about working for Gypsum. [*Id.* at 24]. On August 31, 2016, Curtis reached out to Zimmerman and expressed concern about "discrimination issues" regarding the treatment of a female applicant who was contacting her, referring to Allen. [Dkt. 146-6 at 130]. After Zimmerman advised Curtis to tell the applicant to apply next year, Curtis spoke with Carney in person and expressed concerns about discrimination against women, stating that she wanted to hire Allen but could not do so. [Dkt. 146-7 at 9, 11]. The same day, Carney sent an email titled "sexual discrimination" to both Deloff and Zimmerman, where she stated that she learned about a female applicant who had been calling about employment and warned that Gypsum could face a discrimination charge. [Dkt. 146-6 at 131].

In September 2016, Curtis sent an email to Zimmerman and Carney, expressing concern about discriminating against Allen. [Dkt. 146-8 at 105]. Curtis spoke with Zimmerman several more times about not being permitted to hire female applicants. [Dkt. 146-8 at 30]. Curtis never raised the issue directly to Sheppard or Wight. [Dkt. 134-10 at 33; Dkt. 134-4 at 11–12]. Both Sheppard and Wight denied having any knowledge of any complaints Curtis raised about Gypsum's hiring practices. [Dkt. 134-4 at 11–12, 14; Dkt. 134-10 at 7–8, 11].

On a Gypsum recruiting phone conference call in 2016, Curtis raised concern about her inability to hire female driver trainees and asked when Gypsum would acquire female trainers. [Dkt. 146-8 at 43–44]. She heard someone utter, "Goddamnit, we're not talking about that." [*Id.* at 43]. Sheppard was on the call, and Curtis believed the voice was his. [*Id.* at 43–44].

On or around May 15, 2017, Curtis spoke to Sears-Cornelious about her issue with not being allowed to hire female driver trainees. [Dkt. 146-2 at 8; Dkt. 146-8 at 35]. Immediately after, Sears-Cornelious sent an email to Sheppard, where she informed Sheppard that she has been told that the company does not hire female trainees and asked Sheppard to clarify whether that was true. [Dkt. 146-2 at 9, 18].

On May 17, 2017, Sheppard fired Curtis. According to Curtis and Carney, Sheppard told Curtis she was being fired not for performance reasons, but because Gypsum needed a recruiter to be at the Vanlue terminal. [Dkt. 146-8 at 33]. According to Sheppard, he informed Curtis that she was being terminated due to her lack of production as a recruiter. [Dkt. 134-10 at 24]. Sheppard authorized Curtis's termination on an employee change form, which indicated that the reason for termination was "performance, looking to move the position closer to Vanlue for better results." [Dkt. 146-8 at 109].

**B. Heather Isaacs**

Heather Isaacs joined Gypsum as a recruiter in November 2014. [Dkt. 146-13 at 6–7]. From June 2016 through her departure from Gypsum, Isaacs knew that she could not hire inexperienced female flatbed drivers due to Gypsum's same-sex

training program and the lack of experienced female trainers. [*Id.* at 23, 32]. On weekly conference calls, she and other recruiters were instructed not to hire female student drivers. [Dkt. 146-10 at 6; Dkt. 146-8 at 25]. For that reason, she did not spend much time speaking to inexperienced female applicants or trying to recruit them. [Dkt. 146-13 at 32].

At the same time, Isaacs was under pressure to improve her recruiting numbers. In her November 2016 performance evaluation, Zimmerman assessed her recruiting as "unacceptable," instructed her to "demonstrate immediate improvement," and warned that her "[f]ailure to meet and sustain improved performance [would] lead to disciplinary action up to and including termination." [*Id.* at 130–31]. At Gypsum's January 2017 safety banquet, Wight told her she was doing a "terrible job" and that she needed to improve her hiring numbers or that she "was going to be gone." [*Id.* at 37]. Isaacs resigned from Gypsum on July 16, 2017. [*Id.* at 6].

Isaacs described her last four or five weeks at Gypsum as "hell" and stated that her efforts to hire an inexperienced female driver put pressure on the relationship between her and her terminal manager. [*Id.* at 41]. She described feeling uncomfortable going to work and worried whether she might get into trouble for participating in discrimination. [*Id.*].

### C. Procedural History

The investigation that led to the instant litigation began on August 10, 2017, when Curtis filed a Charge of Discrimination with the EEOC alleging she was

retaliated against for raising concerns about the company's policies regarding the hire of inexperienced female applicants. [Dkt. 131-1 at 2; Dkt. 131-2 ]. On September 28, 2017, Isaacs likewise filed a Charge of Discrimination, contending that she was subjected to a hostile work environment and constructively discharged by being forced to participate in the allegedly discriminatory recruitment program. [*Id.*]. Upon investigation, the EEOC issued Letters of Determination for Curtis and Isaacs on June 7, 2022. [*Id.*]. These Letters notified Gypsum that the EEOC found reasonable cause to believe Gypsum violated Title VII of the Civil Rights Act of 1964 through its termination of Curtis, its constructive discharge of Isaacs, and by engaging in a pattern or practice of sex discrimination since 2014 in its refusal to hire otherwise qualified female applicants as flatbed drivers. [*Id.*]. Upon issuance of the Letters, the EEOC and Gypsum engaged in conciliation, the details of which are discussed further below.

After conciliation efforts proved unsuccessful, the EEOC filed this suit on September 30, 2022, alleging a disparate-treatment-pattern-or-practice-of-hiring-discrimination claim, alongside individual claims regarding Curtis and Isaacs. [Dkt. 1]. The matter was bifurcated on July 24, 2023, by order of Magistrate Judge Edward B. Atkins, in accordance with the framework set forth in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). [Dkt. 35]. Following the close of Phase I discovery, the EEOC moved for partial summary judgment as to the Phase I pattern-or-practice claim on January 6, 2026. [Dkt. 131]. Gypsum likewise moved for summary judgment on the same day as to both the pattern or practice claim, as

well as the individual claims regarding Isaacs and Curtis. [Dkt. 134; Dkt. 135]. These matters are now fully briefed and ripe for review.[2]

## II. Analysis

The Court's role at the summary judgment stage is not to "make credibility determinations . . . or resolve [any] material factual disputes." *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013). Instead, all facts must be construed, and all reasonable inferences must be drawn, in favor of the non-movant. *Id.* Viewing the record in this light, the Court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

[2] A separate opinion addresses the cross-motions for summary judgment on the pattern-or-practice claim.

### A. Gypsum is not entitled to summary judgment on Count II.

The EEOC alleges that Gypsum violated Title VII's anti-retaliation provision by firing Chris Curtiss in retaliation for engaging in protected activity under Title VII. [Dkt. 1]. Title VII's anti-retaliation provision states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

"In an action under Title VII, the plaintiff may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Swierkiewicz v. Sorema,* 534 U.S. 506, 511 (2002); *Laderach v. U–Haul of Nw. Ohio,* 207 F.3d 825, 829 (6th Cir.2000)).

"To establish a *prima facie* case of unlawful retaliation under Title VII, the plaintiff must demonstrate by a preponderance of the evidence that: 1) [she] engaged in activity that Title VII protects; 2) defendant knew that [she] engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists." *Id.* (citing *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). "The burden of establishing a *prima facie case* in a retaliation action is not onerous, but one easily met."' *Id.* (quoting *Nguyen*, 229 F.3d at 563). "After proving

the existence of a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Nguyen*, 229 F.3d at 562 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext." *Abbott*, 348 F.3d at 542 (citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994)).

1. The EEOC's prima facie case.

To make out a prima facie case, the EEOC must demonstrate by a preponderance of the evidence that: 1) Curtis engaged in activity that Title VII protects; 2) Gypsum knew that she engaged in this protected activity; 3) Gypsum subsequently took an employment action adverse to Curtis; and 4) there exists a causal connection between the protected activity and the adverse employment action. *Abbott*, 348 F.3d at 541–42 (citing *Strouss*, 250 F.3d at 342; *Nguyen*, 229 F.3d at 563).

Gypsum argues that the EEOC has failed to demonstrate by a preponderance of the evidence that Gypsum knew Curtis engaged in protected activity. [Dkt. 134-1 at 25–29; Dkt 160 at 8–15]. "[A] plaintiff may survive summary judgment by producing circumstantial evidence to establish [the knowledge] element of her claim." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). But where, as here, the decisionmakers deny having such knowledge, the plaintiff must produce direct or circumstantial evidence "to rebut [the] denials." *Id.* Mere "conspiratorial theories" or "flights of fancy, speculation, hunches, intuitions, or rumors" will not do. *Id.*

(quoting *Visser v. Packer Eng'g Assocs., Inc.,* 924 F.2d 655, 659 (7th Cir.1991) (en banc)).

A plaintiff can establish an employer's knowledge by showing that there were prior interactions between the individuals who had the requisite knowledge and those who actually took the adverse employment action. *See Highfield v. City of Vanceburg, Ky.*, 643 F. Supp. 3d 706, 728 (E.D. Ky. 2022) (quoting *Mulhall*, 287 F.3d at 553)). But the mere fact of those prior interactions alone does not allow a reasonable jury to infer that the knowledge was passed on to the decision maker who actually took the adverse employment action. Instead, "[a] reasonable jury could make this inference [only] when the plaintiff produces evidence that such prior interactions make it 'highly improbable' that the individual who knew of the plaintiff's protected activity did not share this information with the second individual who actually took the adverse employment action as soon as the first individual obtained the information." *Garrett v. Mercedes-Benz Financial Services USA LLC*, 331 F. Supp. 3d 699, 715 (E.D. Mich. 2018) (quoting *Mulhall*, 287 F.3d at 553). In other words, the circumstances have to indicate that the person with knowledge most likely shared the requisite knowledge with the decision maker.

The EEOC relies heavily on circumstantial evidence, arguing that Curtis's repeated communications with Zimmerman, Carney, Deloff, and Sears-Cornelious about alleged discrimination against female flatbed applicants and their respective interactions with Wight and Sheppard could lead a reasonable jury to find that Sheppard and Wight had knowledge of Curtis's protected activity. [Dkt. 146 at 19–

21]. For example, Deloff was aware of Curtis's complaints, worked in the same office as Wight, and communicated with him about personnel issues that should be escalated to his attention. [Dkt. 146-6 at 131; Dkt. 146-1 at 6; Dkt. 146-5 at 4]. And Sears-Cornelious, who reported directly to Sheppard, reached out to Sheppard by email to ask about Gypsum's hiring practices immediately after Curtis informed her that Gypsum did not hire females. [Dkt. 146-2 at 9, 18]. Critically, Curtis testified that, at a conference call at which Sheppard was present, she raised concerns about her inability to hire female driver trainees and asked when Gypsum would hire female trainers. [Dkt. 146-8 at 43, 44]. A voice she believed belonged to Sheppard said, "Goddamnit, we're not talking about that." [*Id.* at 43]. The Court does not find EEOC's circumstantial evidence to be a conspiratorial theory or mere flight of fancy. A reasonable jury could find that Sheppard and/or Wight knew of Curtis's protected activity. And a reasonable jury could also reject that. That is the jury's prerogative. The point is that there is a genuine issue of material fact on this point, and so it is not suitable for resolution on summary judgment. "[T]he jury—not the court—assesses the credibility of witnesses and decides how much weight to give their testimony." *United States v. Craft*, 717 F. App'x 601, 602 (6th Cir. 2018) (citing *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

Gypsum next argues that the EEOC has failed to demonstrate by a preponderance of the evidence that there is a causal connection between Curtis's protected activity and her termination. [Dkt. 134-1 at 26–27]. "To establish the causal connection required . . . a plaintiff must produce sufficient evidence from which

an inference could be drawn that the adverse action would not have been taken had the plaintiff not [engaged in the protected activity]." *See Nguyen*, 229 F.3d at 563 (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)). "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* (citing *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir. 1987)).

A reasonable jury could find that there is a causal connection between Curtis's protected activity and her termination. The short period of time—two days—between Curtis's communication with Sears-Cornelious (and Sears-Cornelious's subsequent conversation with Tim Sheppard) about Gypsum's hiring practices and her termination supports the inference of a causal connection. *See Nguyen*, 229 F.3d at 563. So does the reality that other similarly situated recruiters failed to meet their hiring goals but remained employed. *See id.* at 563 (explaining that "evidence that defendant treated the plaintiff differently from similarly situated employees" is a relevant factor in the causation analysis). Although Gypsum argues that Curtis and the other under-performing recruiters are not similarly situated, [Dkt. 160 at 18–19], they need only be "similar in 'all relevant aspects'"; "[e]xact correlation is not required." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Under the circumstances of this case, a reasonable jury could find that there is a causal

connection between Curtis's protected activity and her termination. Thus, the EEOC has sufficiently made out a prima facie case of retaliation.

2. Gypsum's legitimate, non-retaliatory reason for terminating Curtis.

Because the EEOC has established a prima facie case of retaliation, the burden shifts to Gypsum to articulate a legitimate, non-retaliatory reason for the termination of Curtis's employment. Gypsum argues that Curtis was fired for performance reasons. [Dkt. 134-1 at 27–29]. Because Curtis routinely failed to meet the required recruiting numbers and her performance reviews highlighted deficiencies, Gypsum meets its burden. [*Id.*].

3. The EEOC has raised a genuine issue of material fact as to pretext.

Because Gypsum has articulated a legitimate, non-retaliatory reason for Curtis's termination, the last thing to be determined is whether there is a genuine dispute about whether Gypsum's proffered reason for Curtis's termination was pretextual. *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887–88 (6th Cir. 2020). "To satisfy [its] burden and survive summary judgment, [the EEOC] must 'produce specific evidence from which a jury could reasonably reject [Gypsum's] explanation of why it fired [Curtis].'" *Id.* (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "This 'is a commonsense inquiry: did [Gypsum] fire [Curtis] for the stated reason or not?'" *Id.* (quoting *Chen*, 580 F.3d at 400 n.4). The EEOC may establish pretext by showing that Gypsum's proffered reason: (1) has no basis in fact; (2) did not actually motivate the termination; or (3) was insufficient to motivate the termination. *See Miles*, 946 F.3d at 888 (citing *Chen*, 580 F.3d at 400).

The EEOC contends that Gypsum's proffered reason did not actually motivate Curtis's termination. [Dkt. 146 at 22–25]. The EEOC argues that other recruiters, such as Casias, Smith, and Isaacs, fell short of their recruiting goals, yet the only recruiter who was fired was the one who engaged in protected activity: Curtis. [*Id.* at 23–24]. Although Gypsum contends that Curtis was fired because her performance was worse than that of the other recruiters, the parties genuinely dispute what performance expectations Gypsum had for other recruiters and, in turn, how Curtis's deficiencies compared to those of other recruiters. [*Id.* at 24; Dkt. 160 at 19–21]. Moreover, Sears-Cornelious testified that "all the recruiters had attention-to-detail issues, every one of them." [Dkt. 146-2 at 15]. Additionally, Sears-Cornelious, who had taken over supervision of the recruiters at the time Curtis was terminated, testified that "there was no talk of firing" Curtis prior to Curtis's May 15, 2017 email to Sears-Cornelious.[3] [Dkt. 146-2 at 16]. For these reasons, the EEOC has raised a genuine issue of material fact that the proffered reason for Curtis's termination was a pretext for retaliation, and, thus, summary judgment should be denied as to Count II.

In summary, the Court finds that, while the EEOC's retaliation claim might have some weaknesses, it survives summary judgment and is for a jury to decide.

[3] Gypsum contends that Sears-Cornelious's opinion as to why Curtis was terminated is inadmissible. [Dkt. 160 at 17]. The Court has not considered this opinion in ruling on the motion for summary judgment because there are genuine issues of material fact even without considering it. At this juncture, the Court is not ruling on the admissibility of that opinion. Its admissibility will be determined at the time of trial, or in advance of trial through a ruling on a motion *in limine*.

**B. Because Heather Isaacs is not within Title VII's "zone of interests," Counts III and IV fail as a matter of law.**

The EEOC brings two claims under Title VII of the Civil Rights Act of 1964 ("Title VII") on behalf of Heather Isaacs ("Isaacs"). In Count III, the EEOC alleges that Gypsum has engaged in unlawful employment practices in violation of 42 U.S.C. § 2000e-2(a)(1) by requiring Isaacs to, as part of her job duties, engage in sex-based discriminatory hiring practices that adversely affected her terms, conditions, or privileges of employment. [Dkt. 1 at 11]. The EEOC says this amounted to a hostile work environment. [Dkt. 146 at 25]. In Count IV, the EEOC alleges that Gypsum constructively discharged Isaacs in violation of 42 U.S.C. § 2000e-2(a)(1). [Dkt. 1 at 11–12].

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII permits the EEOC to bring a civil action only on behalf of individuals who were "aggrieved by the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(f)(1). An individual is not "aggrieved" unless he or she "falls within the zone of interests protected by Title VII." *Thompson v. North American Stainless, LP*, 562 U.S. 170, 178 (2011). Thus, as a threshold matter, the Court must determine whether Isaacs falls within that zone.

In *Thompson v. North American Stainless, LP*, Eric Thompson sued North American Stainless ("NAS") for retaliation under 42 U.S.C. § 2000e-3(a). *See* 562

U.S. at 172. Thompson and his fiancé, Miriam Regalado, were employees of NAS. *Id.* But when the EEOC notified NAS that Regalado had filed a charge alleging sex discrimination, NAS fired Thompson. *Id.* Thompson brought suit against NAS, alleging that NAS "fired him in order to retaliate against Regalado for filing her charge with the EEOC" in violation of 42 U.S.C. § 2000e-3(a). *See id.* After holding that NAS violated Title VII's anti-retaliation provision, the Supreme Court considered whether Thompson was a "person claiming to be aggrieved" under Title VII. The Court explained:

> We have described the "zone of interests" test as denying a right of review "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." We hold that the term "aggrieved" in Title VII incorporates this test, enabling suit by any plaintiff with an interest "arguably [sought] to be protected by the statute," while excluding plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII.

*Id.* at 177–78 (citations omitted). Applying that test, the Court concluded that "Thompson [fell] within the zone of interests protected by Title VII" and was therefore "a person aggrieved with standing to sue." *Id.* at 178. "Thompson was an employee of NAS, and the purpose of Title VII is to protect employees from their employers' unlawful actions." *Id.* The Court also emphasized that "Thompson [was] not an accidental victim of the retaliation—collateral damage, so to speak, of the employer's unlawful act." *Id.* Rather, "hurting him was the unlawful act by which the employer punished [Regalado]." *Id.*

Relying on *Thompson*, Gypsum argues that the EEOC may not bring claims on behalf of Isaacs because Isaacs does not fall within the zone of interests protected by Title VII and thus was not "aggrieved" under 42 U.S.C. § 2000e-5(f)(1). [Dkt. 134-1 at 20–22]. The Court agrees.

Again, § 2000e-2(a)(1) makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, *because* of such individual's . . . sex." (emphasis added). Unlike the anti-retaliation provision considered in *Thompson*, § 2000e-2(a)(1) is "limited to discriminatory actions that affect the terms and conditions of employment." *Thompson*, 562 U.S. at 174 (quoting *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 64 (2006)). Necessarily, the elements of the two theories the EEOC brings under § 2000e-2(a)(1)—constructive discharge and hostile work environment—require discrimination directed toward Isaacs. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) (explaining that a hostile work environment claim requires a plaintiff to establish that "she was subjected to unwelcome harassment . . . based on sex or race"); *Green v. Brennan*, 578 U.S. 547, 555 (2016) (explaining that a constructive discharge claim requires a plaintiff to establish "that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" (citing *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004))).

As Gypsum argues, the EEOC does not allege that Isaacs was subjected to discrimination on the basis of sex or that she was required to participate in alleged

discriminatory hiring practices *because* she was female.[4] [Dkt. 134-1 at 21]. Rather, the EEOC's theory appears to be that requiring Isaacs to participate in discriminatory hiring practices against *others*—prospective employees—adversely affected her "terms, conditions or privileges of employment." [*Id.*].

On these facts, the Court finds that Isaacs does not fall within the zone of interests protected by Title VII. Although Title VII seeks to prevent employees from being discriminated against by their employers, it does not operate to provide employees with a cause of action to remedy discrimination directed toward third parties. Moreover, even assuming Isaacs was "technically . . . injured in an Article III sense," Isaacs was, at most, "an accidental victim" of the discrimination directed towards prospective employees—in other words, "collateral damage." *See Thompson*, 562 U.S. at 178.

Ample authority supports this conclusion. In *Jackson v. Deen*, 959 F. Supp. 2d 1346, 1348–51 (S.D. Ga. 2013), the plaintiff, a white female employee, alleged that her employer engaged in racial discrimination against African-American staff, which included prohibiting African-American staff from using the customer restroom and working as hostesses, as well as directing frequent racist jokes towards them. The

[4] Although the EEOC alleged in its Complaint that the effect of "requiring Heather Isaacs as part of her job duties to engage in sex-based discriminatory hiring practices" "has been to . . . adversely affect her status as an employee because of sex," [Dkt. 1 at 11], it does not presently argue that Isaacs was compelled to participate in the alleged discriminatory hiring practices *because* she was female. More importantly, it has not presented any evidence to that effect. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990) ("[M]ere conclusory allegations are not sufficient to withstand a motion for summary judgment.").

plaintiff alleged "that the racist atmosphere in the workplace caused her immense personal and work related emotional and physical distress" and "significant personnel management challenges" because "[e]mployees came to her to complain and for help, which she felt obligated to give but was unable to fully provide." *Id.* at 1350. The court held that the plaintiff was "not an aggrieved party under Title VII because her interests [were] not those arguably sought to protected by that statute." *Id.* at 1354 (citing *Thompson*, 562 U.S. at 175–77). Her claimed injuries—the deprivation of "harmonious working relationships with her African-American subordinates" and "the right to work free from racial harassment"—were "not interests sought to be protected by Title VII." *Id.* ("[Title VII] does not operate to provide individuals working unaffected by unlawful racial discrimination with a cause of action to remedy racial discrimination directed toward third parties"). "At best, [the plaintiff was] an accidental victim of the alleged discrimination." *Id.*

Similarly, in *Cochran v. Five Points Temporaries, LLC*, 907 F. Supp. 2d 1260, 1266, 1270 (N.D. Ala. 2012), the plaintiff alleged that her employer's discriminatory conduct against African-American employees, which offended her and to which she was opposed, "created a racially discriminatory and hostile work environment." Finding that the "plaintiff was merely a bystander to whom no discriminatory or harassing conduct was actually directed" and thus "an 'accidental' victim" under *Thompson*, the court held that the plaintiff's interests were not those arguably sought to be protected by Title VII. *Id.* at 1268; *see also Holiness v. Moore–Handley, Inc.*, 114 F. Supp. 2d 1176, 1187 (N.D. Ala. 1999)) (finding that the plaintiff "cannot recover

for the harassment allegedly suffered by [her] co-employees[s]" (alteration in original)).

Isaacs is similar to the plaintiffs in *Deen* and *Cochran*. As with those plaintiffs, the discriminatory behavior at issue here was not directed to Isaacs, nor was she a victim of it. Moreover, like the plaintiffs in *Deen* and *Cochran*, Isaacs was not exposed to the discriminatory conduct *because* of her protected status. In other words, the discriminatory behavior was not something that she was exposed to *because* she was a woman. Instead, she incidentally encountered the conduct because of her position with the company. The conduct might have upset her, but she was not a victim of it. Title VII protects individuals from being victimized by discrimination, not from being upset about discrimination that is victimizing *other* individuals.

The cases the EEOC relies on do not alter this conclusion. [Dkt. 146 at 29–32]; *Finn v. Kent Security Servs.*, 981 F. Supp. 2d 1293, 1300 (S.D. Fla. 2013) (denying the defendant's Fed. R. Civ. P. 12(b)(6) motion to dismiss the plaintiff's discrimination claim because the Plaintiff *might* be within the zone of interest of Title VII if she was compelled to serve as her employer's "conduit of . . . discrimination"); *Lindblad v. J&L Servs., Inc.*, No. 4:18-cv-1336-RBH-TER, 2019 WL 653968 (D.S.C. Jan. 30, 2019) (similar). Neither decision binds this Court, and both were decided at the Fed. R. Civ. P. 12(b)(6) stage, where the court was without the benefit of the discovery present here.[5]

[5] Lastly, the EEOC cites a number of cases standing for the proposition that "Title VII forbids discrimination on the basis of association with or advocacy for a protected party." *See, e.g.*, *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009); [Dkt.

Because Isaacs is not within Title VII's zone of interests, she is not an "aggrieved" individual on whose behalf the EEOC may bring a claim.[6] Accordingly, Counts III and IV cannot survive summary judgment.

**C. Isaacs was not constructively discharged.**

Setting aside the foregoing discussion, Count IV still fails as a matter of law because Isaacs was not constructively discharged. "To establish a claim for constructive discharge, a plaintiff must prove: (1) the employer deliberately created working conditions that a reasonable person would perceive as intolerable, (2) the employer did so to force the employee to quit, and (3) the employee quit." *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 373 (6th Cir. 2024) (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)). "Intolerability is a demanding standard." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (6th Cir. 2020). And, based on the evidence in the record, a reasonable trier of fact could not find that demanding standard is met here.

---

146 at 28 n.13]. For the simple reason that plaintiff has neither alleged advocacy on behalf of or association with female applicants for positions at Gypsum nor argued that such association or advocacy caused Gypsum to alter her "terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), its reliance on this line of cases is misplaced. *See Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 266 (6th Cir. 2001) ("Here, plaintiff has not alleged advocacy on behalf of, or any association with, members of a protected class. Thus, she cannot state a claim for racial discrimination under Title VII.").

[6] The EEOC's hostile-work-environment claim pertaining to Isaacs cannot survive summary judgment for the additional reason that such claims require proof that the individual at issue was subjected to harassment *on the basis of sex*. *See, e.g.*, *Kellar v. Yunion, Inc.*, 157 F.4th 855, 873 (6th Cir. 2025) (citations omitted); *see also Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (citations omitted). No such proof exists here. In other words, there is no proof that Isaacs was harassed, much less that anything that allegedly happened to her happened because she is a woman.

Indeed, the Sixth Circuit has already declined to find constructive discharge in a situation more egregious than the one Isaacs claims to have experienced in this case. *See, e.g.*, *Brister v. Michigan Bell Tel. Co.*, 705 F. App'x 356, 360 (6th Cir. 2017) (affirming summary judgment despite allegations that supervisor routinely harassed and humiliated employee, told her that everyone hated her and did not want her there, and told her she needed psychological help). Put simply, if the plaintiff in *Brister* was not constructively discharged, no reasonable jury could find that Isaacs was. Additionally, the EEOC has not produced evidence that Gypsum directed any conduct toward Isaacs with the intent to force her to quit.

## III. Conclusion

For these reasons, it is hereby **ORDERED** as follows:

1. Gypsum's Motion for Summary Judgment, [Dkt. 134], is **GRANTED in part as to Counts III and IV**, and **DENIED in part as to Count II**.
2. The EEOC's Motion for Leave to File a Surreply, [Dkt. 167], is **DENIED**.

Signed this 29th day of September, 2026.

S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky